McNABB v. KANSAS CITY LIFE INS. CO.

No. 12601.

Circuit Court of Appeals, Eighth Circuit.

Dec. 28, 1943.

592

Max Putnam, of Des Moines, Iowa (C. C. Putnam and F. S. Fillmore, both of Des Moines, Iowa, on the brief), for appellant.

Phineas M. Henry, of Des Moines, Iowa (Ray B. Lucas, of Kansas City, Mo., on the brief), for appellee.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

A life insurance agent sued the company for wrongful termination of his general agency contract. On a trial without a jury, the court held, among other things, that the termination was by mutual consent and agreement, and that there accordingly had been no breach. The agent has appealed.

The contract was made at the home office of the company in Missouri. The agency territory was the State of Iowa. The effective date of the relationship was January 2, 1939. The duration period was not specified. The compensation was to consist of graded commissions on initial and renewal premiums from insurance written personally or by local agents.

The agent moved to Iowa from Missouri and began work under the contract. From the start and during the whole time that the contract was in force, he was obliged to ask the company for loans or advances to help finance his operations. He complained on several occasions to the company's superintendent of agencies of his difficulty in meeting personal obligations.

Approximately two years went by. Then the company wrote him a letter which is the basis of this suit. This letter, dated December 30, 1940, declared: "The management has decided to discontinue general agency contracts in force two years or longer that have failed to meet volume requirements. * * * Your issued business for the year to date is * * * less than half the required amount. We will accept your resignation as general agent effective January 2, 1941. * * * We will be pleased to have you continue your connection with the company for the writing of personal business, and, until a general agent is appointed for that territory, we would allow you the same commissions and renewals you are now receiving under your general agency contract. When a general agency appointment is made, that arrangement would be discontinued and you would then receive 70% graded first year commissions and 9 renewals at 5%. While I regret that you have not been able to secure the results you expected as a general agent, I am confident you would meet with success if you would devote your entire attention to the writing of personal business. I trust you will decide to retain your connection with the company." A terse and more formal letter was also sent stating: "Your general agency contract dated January 2, 1939, will be discontinued January 2, 1941, for failure to meet the volume requirements provided for in your contract."

The agent contended, in instituting suit, that the volume provision did not constitute a contractual condition; that it was intended and had been represented as a mere quota-aim or "something to shoot at"; that, in any event, as a termination reason, it was wholly subterfuge and bad faith, because the company did not take a similar step as to other general agents in the same situation; and that the cancellation was not otherwise justifiable, because the contract had a lifetime tenure and was not subject to being terminated at will.

What the legal duration of the contract was originally intended to be—from its language, by the company's representations, or as a matter of mutual interpretation—it is unnecessary to consider. Nor is it material whether the notice of intended termination on January 2, 1941, rested upon a valid or justifiable ground. The record clearly establishes that the agent, without any regard to these questions, legally con-

sented and agreed to the termination of the general agency contract, and he therefore cannot claim to have a right of action for general breach, on either of these bases.

The company's letters of December 30, 1940, were received by the agent on December 31, 1940. On the same day, he wrote the company as follows: "Your letter of December 30th with reference to my production in Iowa for the past year has been received and you may accept this letter as my resignation effective January 2, 1941. I want to thank you for your offer of allowing my contract to remain on the 80% basis if I decide to stay on as one of your agents."

Thereafter, on January 22, 1941, the company and the agent executed a joint memorandum which, after reciting that it was to be "attached to and forming part of the contract dated January 2, 1939," provided that "It is mutually agreed that the first year commissions recited in this contract shall be reduced to a regular 70% contract basis whenever the Company appoints a new general agent for the State of Iowa, and that renewal commissions will be reduced to a 5% basis." The execution of this memorandum plainly constituted a further confirmation of the agent's assent to the termination of his general agency relationship, which he had already expressed in his letter of December 31, 1940, and to the conversion of his status to one of personal production only, except that the previous commission scale was to be allowed to continue until his successor had been duly appointed.

The agent, however, calls attention to the fact that from the time the letters of December 30, 1940, were received, he never undertook to write any further business for the company. Had he done so after January 2, 1941, this would perhaps have added still further confirmation of his assent; but the fact that, after transmitting his letter of December 31, 1940, and after executing the memorandum of January 22, 1941, he decided to have nothing further to do with the company could hardly operate as a nullification of the legal effect of these instruments.

But, in a further effort to escape the situation, the agent contends that his letter of "resignation" was sent upon the condition and understanding that "they were going to settle up with him on his agency". He offered to prove that, before sending in his letter of December 31, 1940, he talked with the company's supervisor over the telephone and was told "not to get excited, that he should just play ball with the boys because they were going to settle up with him on his agency, and that one of them would be down right away to see him at the office, and that he should just relax on the matter, and it was going to come out all right, and * * * that he sent the letter of December 31st responsive to the statement thus made * * * on the basis of the company coming down and settling up with him if they elected to accept his resignation".[1] The trial court, in rejecting this offer, said: "Because they did not treat him as he thought they should would not have any effect upon that letter. Just because there were matters or hopes of adjustment, I don't know what that would have to do as bearing upon the validity of the resignation."

There is in the record also a letter dated January 2, 1941, from the agent to the company, stating: "I had a talk Tuesday night, by phone, with Mr. Maurice Smith [supervisor of agents] and I find that after taking an inventory of my personal business, it will be necessary for me to close out my entire account in order that I may be able to take care of my obligations. I have had a considerable amount of travel expense. This, to a large extent, I will be able to eliminate, under the new set-up. This is the first time in my experience that I have been confronted with a situation of

---

[1] One of the trial court's conclusions was that "the defendant did not expressly cancel said contract but that the plaintiff terminated the agency created by said contract by his written resignation and by his execution of the agreement between the parties dated January 22, 1941." In spite of the recognition made by the agent in the offer of proof set out above, that he had submitted "his resignation", and the necessary implication that the company's letter of termination was not to be effective until January 2, 1941, it is argued here that the trial court's conclusion is clearly erroneous because the company's letter of December 30, 1940, constituted an automatic and immediate termination. As suggested in the opinion above, we think that the termination, under the evidence, was legally one of mutual consent and agreement. This it seems to us is also the intended effect of the trial court's conclusion, and we so construe it here.

this kind, as in the past I have been able to have a regular income by which I was able to take care of my monthly obligations. I am not worrying about the money I have invested in this agency—this I am willing to charge off and forget about it—but I have to face the responsibility of my obligations which I have made."

Just what kind of a settlement it is meant to be implied that the agent's resignation was intended to be conditioned upon, we cannot tell from either the record or the briefs. Neither the letter of resignation nor the subsequent memorandum agreement can be said to be conditional in language or to have been legally conditional in delivery. We can find nothing that suggests that the agent at that time contended that the company had committed a breach and that he was led to believe that on that basis he was going to be paid $130,000 or any other sum in general damages. There is nothing that suggests that he had conditioned his resignation or assent upon any payment for loss of "probable first year commissions and probable renewal commissions upon the new business which the plaintiff and his agency would reasonably and probably have written", during the balance of his lifetime —if the contract could at all be said to have originally had such an intended duration, as he now contends. He certainly could not have assumed that he would be paid the $10,000, which he seeks to make part of his recovery, for expenditures made in soliciting personal business or in contacting local agents—upon whose policies he was to receive a commission—because his letter of January 2, 1941, specifically and contrarily stated that "the money I have invested in this agency—this I am willing to charge off and forget about it".

■ The only surmise possible therefore is that he expected that the company would be willing to commute his accruing renewal-commission rights and would make a purchase of that account. That much might perhaps be spelled out of the statement in his letter of January 2, 1941, that "it will be necessary for me to close out my entire account in order that I may be able to take care of my obligations." But his expectations could not nullify the legal effect of his plain, positive actions, and even less could our surmise as to his intentions be permitted to do so. On the record, as to both the evidence received and the offer of proof made, the trial court cannot be said

to have been "clearly erroneous" in taking the position that, whatever the agent intended or believed, his contention that the submitting of the resignation-letter and the execution of the subsequent memorandum agreement were subject to a legal condition, which the company had not fulfilled, was without any sound basis, and that legally therefore there could not be claimed to have been anything in the situation but hopes and expectations.

■ Under the law of both Missouri and Iowa, the executory portions of a contract, where bilateral obligations are involved, may validly be terminated by mutual consent or agreement without other consideration. Curry v. Boeckeler Lumber Co., 224 Mo.App. 336, 27 S.W.2d 473; Rogers v. Fremder, Mo.Sup., 261 S.W. 105; Sheetz v. Price, 154 Mo.App. 574, 136 S.W. 733; Strahn v. Johnson, 197 Iowa 1324, 196 N.W. 731; Mackie Motors Co. v. Dearborn Truck Co., 192 Iowa 458, 185 N.W. 22. Cf. Restatement, Contracts, § 406, Comment a; 6 Williston on Contracts, Revised Edition, 5170, § 1826. The question of the effect of such a termination as a release of specific benefits accrued under the terms of the contract from any previous performance, where no additional consideration is involved, is not before us, for the company makes no contention that the termination resulted in any surrender of the agent's renewal-commission rights, on the business previously written. From the time of the termination, the company had applied the renewal commissions to the payment of the loans which it had theretofore made to the agent, and, after this indebtedness was paid, it offered to pay the agent the accrued commissions and future renewals as the premiums were received. The agent was given judgment for the amount which the company showed had accrued up to the end of the trial, and as to which it had offered to confess judgment.

■ The agent contends that the trial court erred in denying his motion to reopen the judgment, in order to permit inclusion of additional renewals, the amount of which had not been established on the trial, but which were claimed to have become due on the date the judgment was signed and filed. The amount of the judgment was responsive to the evidence in the record on which the case had been submitted. The motion to re-open was filed eight days after the judgment had been en-

tered. Clearly, there was no abuse of discretion in the trial court's refusal to grant a re-opening in this situation, in order to receive evidence on the subsequently accrued commission items.

Finally, it is argued that the judgment should be reversed because the trial court wrongfully denied the agent the right to a jury trial. It is doubtful if any issue of fact actually existed, on the general questions which have been discussed, which a jury would otherwise have been entitled to settle. But, however that may be, the record shows that the agent had not served a demand for a jury trial on the company in the manner and within the time required by Rule 38(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Under Rule 39(b), the trial court, of course, could have exercised its discretion to allow a jury trial, notwithstanding the failure to serve a proper demand, but, in the situation shown, it was not required to do so. Rule 38(d) specifically provides that the failure of a party to serve the required demand constitutes a waiver by him of a trial by jury. Failure to serve such a demand is a legal waiver, whether it is inadvertent or intentional.

The views expressed make the other contentions of the parties uncontrolling.

Affirmed.