**In the Matter óf Parental Rights of GP, JP and SP.**

**LP, Appellant (Respondent),**

v.

**NATRONA COUNTY DEPARTMENT OF PUBLIC ASSISTANCE AND SOCIAL SERVICES, Appellee (Petitioner).**

**No. C–83–5.**

Supreme Court of Wyoming.

March 22, 1984.

John I. Henley of Vlastos, Reeves, Murdock & Brooks, Casper, for appellant.

Nancy Thornton, Casper, for appellee.

Ann Rochelle, Casper, guardian ad litem.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROSE, Justice.

This appeal comes here from an action brought by the appellee, Natrona County Department of Public Assistance and Social Services (DPASS) to terminate the parental rights of the appellant, LP, to his son, JP, and to his two daughters, GP and SP.[1] Appellant raises sensitive and important issues concerning his rights to a jury trial and to a state-funded medical examination of GP. Appellant also challenges the admissibility of certain evidence and the sufficiency of the competent evidence to justify terminating his parental rights to each of his children. We will affirm the judgment of the district court.

Appellant's three children were admitted to the Wyoming State Children's Home on March 1, 1980. At that time, GP was eight

---

1. The names of the appellant father and the children will not be used in this opinion.

years old, JP was four, and SP was almost two. In December, 1981, following a hearing held at the request of the State Children's Home, DPASS assumed the custody and control of JP and SP and placed them with a foster family. GP previously had been placed in the foster care of her natural father.

Based on observations of the physical condition of the children made by State Children's Home personnel and statements of the children themselves, DPASS, in May, 1982, filed a petition to terminate appellant's parental rights on the grounds that he had abused and neglected his three children and had left GP in the care of another person without provision for her support and without communication from him for at least one year. The petition goes on to allege that "the health and safety of *each* of these children will be seriously jeopardized by remaining with or returning to [LP]." (Emphasis added.)

The appellant filed a pro-se answer on June 22, 1982 generally denying the allegations of the complaint and demanding a jury trial but did not deposit the $12.00 statutory fee nor did he serve the jury demand upon DPASS as required by Rule 38, W.R.C.P. On June 28, 1982, the district court found that LP was a needy person and appointed counsel to represent him. On August 16, 1982, DPASS joined in what for LP was a second request for a jury trial, which the district court denied for the reason that it was not timely filed and the jury fee was not deposited with the clerk. Numerous motions were made, including a motion for costs to retain a qualified physician to examine and test GP to determine her prior sexual activity, which motion was denied. On April 25, 1983, the district court filed its order, judgment and decree terminating the parental rights of the appellant to each of his three children on the grounds that they had been abused and neglected by the respondent, that efforts at rehabilitating the family had been unsuccessful and that the health and safety of the children would be seriously jeopardized by returning to the father. The court did not, however, find that GP was left in the care of another person without provision for support and without communication from the appellant for a period of at least one year.

The appellant, LP, submits the following issues for consideration:

"I. The trial court erred in denying the appellant a jury trial.

"II. The trial court erred in refusing the appellant's request for costs for an expert witness to examine GP.

"III. The trial court erred in refusing to allow the testimony of Kathy Peterson, regarding the appellee's pre-termination procedures.

"IV. The trial court erred by admitting the records of the Wyoming State Children's Home, including alleged statements of the children, into evidence.

"V. The trial court erred by admitting the hearsay statements, of GP to Nancy Johnson, into evidence.

"VI. The trial court erred in admitting into evidence the hearsay statements of JP to members of the Children's Home staff, to Walt Murray and to Bea Spiva.

"VII. The trial court erred in admitting into evidence hearsay statements of SP made on November 30, 1981.

"VIII. There was insufficient evidence to prove clearly and convincingly that each of the children were abused and neglected by the respondent, and that each child's health and safety would be seriously jeopardized by the maintenance of the parent-child relationship between the appellant and each of his children."

### Prefatory Concepts

This case was brought under Wyoming's termination-of-parental-rights statutes, i.e., § 14–2–308 through § 14–2–318, W.S.1977, 1983 Cum.Supp. and specifically § 14–2–309, according to which LP, the father, is charged and the court has found that he has "abused and neglected" his three minor children. Section 14–2–309 provides:

"Grounds for termination of parent-child legal relationship; clear and convincing evidence.

"(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

"(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications;

"(ii) The child has been abandoned with no means of identification for at least three (3) months and efforts to locate the parent have been unsuccessful;

"(iii) The child has been abused or neglected by the parent and efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

"(iv) The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child."

Section 14-2-308 refers to § 14-3-202(a)(ii), W.S.1977 for a definition of "abuse." There, abuse is defined as follows:

" 'Abuse' means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, *excessive or unreasonable corporal punishment*, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, *and the commission or allowing the commission of a sexual offense against a child as defined by law * * *.*" (Emphasis added.)

We have held that the right to associate with one's family is a fundamental liberty

under Art. 1, §§ 2, 6, 7 and 36 of the Wyoming Constitution. In *DS v. Department of Public Assistance and Social Services*, Wyo., 607 P.2d 911, 918 (1980), we said:

" * * * The right to associate with one's immediate family is a fundamental liberty protected by the state and federal constitutions. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (integrity of the family unit protected by the due-process clause of the Fourteenth Amendment); and *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322 [1331], 22 L.Ed.2d 600 (1969) (implication that liberties guaranteed by the federal constitution are fundamental). See, also, *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 399 N.E.2d 66 (1980). Analysis of the Wyoming Constitution and case law also leads to the conclusion that the right to associate with one's family is a fundamental liberty. Article 1, Sections 2, 6, 7 and 36, Wyoming Constitution; *Washakie County School District Number One v. Herschler*, Wyo., 606 P.2d 310 (1980); *Matter of Adoption of Voss*, Wyo., 550 P.2d 481 (1976); and *In re Adoption of Strauser*, 65 Wyo. 98, 196 P.2d 862 (1948)."

We also made clear that we indeed felt deeply about the family relationship:

"It may be that in matters such as this, lawyers, judges, parents—all of us—should digress from the ordinary course of things to contemplate how deeply seated the child-parent relationship is in the warp and woof of the American fabric. In this matter, where the law must decide whether a child will be separated from his mother, we have looked to the Declaration of Independence for guidance. We find the following familiar language to be helpful:

" 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are institut-

ed among Men, deriving their powers from the consent of the governed, ...'

"While no complete listing of the 'unalienable rights' endowed upon us can be easily defined—it is not, we suggest, too fantastic to assume that the rearing of our children might be one example of the pursuit of happiness that the founding fathers envisioned. If we accept this hypothesis, then it becomes important to recognize that the rights described in both the state and federal constitutions were formulated to protect the Declaration of Independence. This surely adds significance to the strict-scrutiny concept in matters affecting the rights of parents to rear their children." 607 P.2d at 919.

Strict scrutiny is the test which will be employed when balancing a fundamental right against a compelling state interest, which interest is, in this case, the welfare of the children. The compelling state interest having been established, it is necessary to prove that the method sought to achieve it is the least intrusive of those methods by which the state's interest can be fulfilled. *State in Interest of C,* Wyo., 638 P.2d 165 (1981), with the following citations: *Meloon v. Helgemoe,* 436 F.Supp. 528 (D.C.N.H. 1977), aff'd 564 F.2d 602, cert. denied 436 U.S. 950, 98 S.Ct. 2858, 56 L.Ed.2d 793; *Constructors Association of Western Pennsylvania v. Kreps,* 441 F.Supp. 936 (D.C.Pa.1977), aff'd 573 F.2d 811 (1978); *Alevy v. Downstate Medical Center,* 39 N.Y.2d 326, 384 N.Y.S.2d 82, 348 N.E.2d 537 (1976); *Duranceau v. City of Tacoma,* 27 Wash.App. 777, 620 P.2d 533 (1980); *State ex rel. McDonald v. Whatcom County District Court,* 19 Wash.App. 429, 575 P.2d 1094 (1978), aff'd 92 Wash.2d 35, 593 P.2d 546 (1978); *DS v. Department of Public Assistance and Social Services,* supra. See also, *Matter of Parental Rights of PP,* Wyo., 648 P.2d 512 (1982).

The evidence which will countenance a termination must be clear and convincing (§ 14–2–309(a), supra). We explained what we mean by "clear and convincing" evidence in *Thomasi v. Koch,* Wyo., 660 P.2d 806, 811–812 (1983), where we said:

" * * * This court previously has adopted language to this effect:

" ' * * * When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory.' *Continental Sheep Co. v. Woodhouse,* 71 Wyo. 194, 202, 256 P.2d 97 (1953), quoting language found in *Good Milking Mach. Co. v. Galloway,* 168 Iowa 550, 150 N.W. 710, 712 (1915).

"We further have said that clear and convincing evidence is 'that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.' *MacGuire v. Harriscope Broadcasting Co.,* Wyo., 612 P.2d 830, 839 (1980)."

In *DS v. Department of Public Assistance and Social Services,* supra, we said:

"We admonish that the burden of proving neglect or abuse is upon him who seeks to take the child from the parent. We emphasize that the trial court and the appellate court will strictly scrutinize claims that a natural parent is unfit because of abuse or neglect. This means that the court's duty to protect the child will be balanced against its duty to protect democratic values. It means that termination of parental rights cannot be ordered on the grounds of abuse or neglect unless the showing is clear and unequivocal that the child's health—mental or physical—and/or his social or educational well-being has actually been placed in jeopardy through the neglect or abuse by the parent." 607 P.2d at 919.

## ISSUE NO. 1

### The Jury-Trial Question

The appellant raises three questions which pertain to the jury-trial issue:

1. Does the appellant have a right to a jury trial in a parental-rights-termination suit?

2. If the appellant does have such a right, did he waive it?

3. Did the trial court abuse its discretion under Rule 39(b), W.R.C.P., in denying a jury trial?

*Facts Relevant to the Jury-Trial Question*

In his pro-se answer filed on June 22, 1982, respondent-appellant asserted:

" * * * According to the Rules of Civil Procedure, I am entitled to a trial by jury in the case of my parental rights. I am hereby making it known that I demand that right."

There is no certificate of service in the record to indicate that appellant served the appellee with either the answer or a jury demand. Furthermore, the record stands undisputed to the effect that the appellant failed to deposit the $12.00 jury-demand fee with the clerk of the court, as required by the Wyoming Rules of Civil Procedure. See Rule 38(b)(3), W.R.C.P., infra. When the judge of the trial court determined that the appellant was a needy person and ordered that he was entitled to a court-appointed attorney, no mention was made in the court's order that appellant was entitled to proceed in forma pauperis as to jury-fee requirements.

*Does the Appellant Have a Right to a Jury Trial?*

The answer to this question is that the appellant *does* have a statutory right to a jury trial in a parental-termination proceeding. Section 14–2–312, W.S. 1977, 1983 Cum.Supp., provides in relevant part:

" * * * The Wyoming Rules of Civil Procedure, including the right of a parent, child or interested person to demand a jury trial, shall be applicable in actions brought under this act."

*Waiver of Jury-Trial Rights*

It is to be observed that Rule 38(b)(1) and (3), W.R.C.P., governs the procedures by which a jury demand is made. Rule 38(b)(1) and (3) provides:

"(b) *Demand.*

**2.** Rule 5(d), W.R.C.P. provides:
"All papers after the complaint required to be served upon a party shall be filed with the

"(1) By Whom.—Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after service of the last pleading directed to such issue. Such demand may be endorsed upon a pleading of the party.

\* \* \* \* \* \*

"(3) Jury Fees.—All demands for trial by jury shall be accompanied by a deposit of twelve dollars ($12.00). The jury fees in cases where jury trials are demanded shall be paid to the clerk of the court, and by him paid into the county treasury at the close of each week, and he shall tax as costs in each such case, and in all other cases in which a jury trial is had, a jury fee of twelve dollars ($12.00), to be recovered of the unsuccessful party, as other costs, and in case the party making such deposit is successful, he shall recover such deposit from the opposite party, as part of his costs in the case."

There can be no doubt but that the demand was faulty in that service was not made in compliance with Rule 38(b)(1) and the jury fee was not deposited in compliance with Rule 38(b)(3). Rule 38(d), W.R.C.P. provides that the failure of a party to make a demand for jury as required by this rule and to file it as required by Rule 5(d), W.R.C.P.[2] constitutes a waiver of trial by jury.

We have held that the filing of a jury demand with the clerk does not fulfill the service requirements of the rules. In *Patterson v. Maher*, Wyo., 450 P.2d 1005, 1008 (1969) we said:

"Plaintiff's thesis that the mere filing of a jury demand with the clerk constituted service upon an opposing party under Rule 5(b) goes beyond the wording of the rule and is contrary to the provisions of Rule 38(d) that the failure 'to serve a demand' constitutes a waiver. The Fed-

court either before service or within a reasonable time thereafter."

eral courts have long made clear their position, e.g., in McNabb v. Kansas City Life Ins. Co., 8 Cir., 139 F.2d 591, 595, the court called attention to the specific provision in Rule 38(d), and said, 'Failure to serve such a demand is a legal waiver, *whether it is inadvertent or intentional.*' This court has heretofore stated its thinking regarding the necessity of such service, having held in a proceeding for writ of prohibition that the failure to serve demand for jury precluded jury trial. *State ex rel. Frederick v. District Court of Fifth Judicial District in and for County of Big Horn,* Wyo., 399 P.2d 583, 586, 12 A.L.R.3d 1." (Emphasis added.)

We have also held that the trial court was justified in refusing to honor a jury demand where it was not accompanied by the fee, *Davidek v. Wyoming Investment Company,* 77 Wyo. 141, 308 P.2d 941 (1957), and a late demand constitutes waiver of the right to trial by jury, *Baldwin v. McDonald,* 24 Wyo. 108, 156 P. 27 (1916).

■ We reiterate, then, that failure to properly serve a jury demand and the failure to deposit the fee constitute a waiver of the right to a jury trial.

*Abuse of Discretion?* (The Pro-se Litigant)

Notwithstanding the aforesaid rules of waiver applicable to jury trials, the appellant argues that, for the district court to have refused to give effect to the jury demand was an abuse of discretion under Rule 39(b), W.R.C.P. This rule provides:

"Trial by jury or by the court.

\* \* \* \* \* \*

"(b) *By the court.*—Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues."

The burden of appellant's argument under this contention is that, since he was a pro-se litigant and did not know or understand the rules, it was an abuse of the court's discretion not to make room for his inadequacies and grant the jury trial notwithstanding his inadvertent waiver of this right. The appellant cites no authority for treating a pro-se litigant any different than any other litigant.

■ A pro-se litigant will be granted no greater right than any other litigant and he must expect and receive

"\* \* \* the same treatment as if represented by an attorney." *Suchta v. O.K. Rubber Welders, Inc.,* Wyo., 386 P.2d 931, 933 (1963), citing *Morgan v. Sylvester,* D.C.N.Y., 125 F.Supp. 380, aff'd 220 F.2d 758 (2 Cir.1955), cert. denied 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768, reh. denied 350 U.S. 919, 76 S.Ct. 201, 100 L.Ed. 805; *Monastero v. Los Angeles Transit Company,* 131 Cal.App.2d 156, 160–161, 280 P.2d 187 (1955).

A party will not be permitted to benefit from his failure to employ counsel, *Suchta v. O.K. Rubber Welders Inc.,* supra. To treat the pro-se litigant differently or to accommodate his refusal to employ counsel would be to unjustly reward his ignorance. This thought was expressed in *Lombardi v. Citizens National Trust & Savings Bank of Los Angeles,* 137 Cal.App.2d 206, 289 P.2d 823 (1955), where the court said:

"A litigant has a right to act as his own attorney, *Gray v. Justice's Court,* 18 Cal.App.2d 420, 63 P.2d 1160, 'but, in so doing, should be restricted to the same rules of evidence and procedure as is required of those qualified to practice law before our courts; otherwise, ignorance is unjustly rewarded.' *Knapp v. Fleming,* 127 Colo. 414, 258 P.2d 489; *Monastero v. Los Angeles Transit Co.,* 131 Cal.App.2d 156, 160–161, 280 P.2d 187." 289 P.2d at 824.

We reiterated these various concepts in *Johnson v. Aetna Casualty and Surety Company of Hartford, Connecticut,* Wyo., 630 P.2d 514, 517 (1981), where we said:

"Appellant represented himself in this matter. One has the right to appear pro se; but when a person chooses to do so, he must be held to the same standard as if he were represented by counsel. He cannot expect the court or the attorneys for other parties to present his case. He cannot be given an advantage by virtue of his pro se appearance, and he cannot be placed at a disadvantage thereby— other than whatever disadvantage results from his decision to proceed without the assistance of counsel. *Stanton v. Chicago, B. & Q.R. Co.*, 25 Wyo. 138, 165 P. 993 (1917), reh. denied 25 Wyo. 138, 167 P. 709 (1917); *Suchta v. O.K. Rubber Welders, Inc.*, Wyo., 386 P.2d 931 (1963)."

Given these holdings, this court stands firmly committed to a rule which says that we will not apply different procedural standards for pro-se litigants than we do for those who come to court represented by an attorney. There was, therefore, no abuse when, in the exercise of his Rule 39(b) discretion, the judge refused to give the pro-se appellant a jury trial, when the appellant's reason for urging the exercise of favorable judicial discretion was that the appellant failed to deposit a jury fee and failed to serve his jury demand upon the opposing party for the reason that he was unfamiliar with the requirements in these respects.

*Trial by Jury Inviolate* (A Criminal Case?)

The appellant further argues his jury-trial contention through the assertion of a deprivation of his Art. 1, § 9, Wyoming constitutional right. This provision of our Constitution says:

"Trial by jury inviolate.

"The right of trial by jury shall remain inviolate in criminal cases * * *."

The appellant has not been charged with a crime in this case and its outcome may not include criminal sanctions or punishment against the appellant. We are here involved with a civil matter—namely, the termination of parental rights and this litigation may not be interpreted as a "criminal case" in order that Art. 1, § 9 of the Wyoming Constitution will be permitted to come to the appellant's rescue for the purpose of insuring a jury trial. An examination of the appellant's authorities shows that they are all distinguishable from the facts and the law of this case. The appellant seems to fantasize that he has been charged with violations of criminal statutes § 14–3–101 and § 14–3–102, W.S. 1977, (repealed and now reappearing as § 6–4–403, W.S. 1977, 1983 Replacement)[3] in order to fortify his contention that he stands exposed to the criminal sanctions provided for in § 14–3–103, W.S. 1977 (repealed and now reappearing in § 6–4–403, W.S. 1977, 1983 Replacement).[4] This argument fails under

---

**3.** Section 14–3–101, W.S.1977 read:

"(a) No parent, guardian or custodian of any child shall:

"(i) Abandon the child without just cause;

"(ii) Abuse, torture, expose or cruelly punish the child; or

"(iii) Knowingly or negligently cause, permit or contribute to the endangering of the child's life, health or welfare."

Section 14–3–102, W.S.1977 read:

"(a) No person shall knowingly:

"Cause, encourage, aid or contribute to a child's violation of any law of this state;

"(ii) Cause, encourage, aid or permit a child to enter, remain or be employed in any house of prostitution or in any· gambling place;

"(iii) Commit any indecent or obscene act in the presence of a child;

"(iv) Sell, give or otherwise furnish a child any drug prohibited by federal law without a physician's prescription; or

"(v) Cause, encourage, aid or contribute to the endangering of a child's health, welfare or morals, including using, employing or permitting a child:

"(A) In any business enterprise which is injurious or dangerous to the health, morals, life or physical safety of the child;

"(B) In any place for any mendicant purposes;

"(C) To be exhibited for the purpose of displaying any deformity of a child, except to physicians;

"(D) In a house of prostitution; or

"(E) In any obscene or indecent exhibition or practice."

**4.** Section 14–3–103, W.S.1977 read:

"(a) Any person violating any provision within W.S. 14–3–101 and 14–3–102 is guilty of a misdemeanor and upon conviction shall be fined not less than one hundred dollars

the disclosure that, while the statutes upon which he relies are indeed criminal in character, the appellant is, nevertheless, not charged with their violation and therefore is not subject to the penalties contemplated by § 14–3–103, W.S. 1977 (now § 6–4–403; 1983 Replacement.)

In *Robertson v. Apuzzo*, 170 Conn. 367, 365 A.2d 824, cert. denied 429 U.S. 852, 97 S.Ct. 142, 50 L.Ed.2d 126 (1976), where the appellant was charged with being the putative father, it was urged that the proceeding was criminal in nature, i.e., "quasi criminal," and thus the indigent defendant who could not pay a $100 jury fee had been deprived of his constitutional rights of due process when his jury demand was rejected.

In holding that a bastardy proceeding, under the Connecticut statutes, was civil rather than criminal in nature, the court observed that the maintenance of a bastard child was sui generis, characterized altogether in the nature of a civil suit. The court noted that the general rules pertaining to a civil suit are applicable; the action can be prosecuted by an individual without joining the state; no punishment can be inflicted; the process is not criminal in nature; the end of the law is to redress a civil injury; and there is no public wrong to be remedied.

All of the above reasons for holding the Connecticut bastardy proceedings to be civil in nature are equally applicable to parental-rights termination proceedings under the relevant Wyoming statutes.

■ For these reasons, the appellant's arguments, to the effect that the criminal nature of the proceedings or the possibility of the enforcement of a termination-of-paternity order through a contempt citation gives him a constitutional right to a jury trial, are without foundation.

*Due Process and the Jury-Fee Question* (The Fundamental-Fairness Concept)

It is further urged that, even though a defendant in a civil action does not have a constitutional right to a jury trial, given the fact that we are here involved in parental-termination proceedings, and it being settled law that the parent/child relationship structures fundamental rights, *DS v. Department of Public Assistance and Social Services,* supra, 607 P.2d 911, the fundamental-fairness characteristics of due process were violated when the judge refused to exercise his discretion in favor of granting a jury trial when that authority was available by rule.

This due-process argument was made in heretofore discussed *Robertson v. Apuzzo,* supra, 365 A.2d 824, a bastardy proceeding where a Connecticut statute was under scrutiny. There, the defendant was indigent and could not pay the jury fee. Having held bastardy proceedings to be civil in nature, the court's decision goes on to comport with the notion that due process is, nevertheless, not denied, in a bastardy proceeding, where a jury trial is waived (whether intentionally or inadvertently) and the court thereafter refuses to exercise discretion in favor of reinstating the jury demand. The rationale for this result is that the defendant is rendered such process as is due when his case is tried by the court without a jury.

In these due-process respects, the appellant makes the following argument:

■ In view of this court's decision that the right to associate with one's family is a fundamental right under Art. 1, §§ 2, 6, 7 and 36 of the Wyoming Constitution and the Due Process Clause of the Federal Constitution (*DS v. Department of Public Assistance and Social Services,* supra), due process of law prohibits a state from denying a defendant a trial by jury solely because he or she is indigent and cannot pay a jury fee. In support of this contention,

($100.00) nor more than one thousand dollars ($1,000.00) plus court costs or imprisoned in the county jail not more than one (1) year, or both.

"(b) Upon the second and each subsequent conviction of subsection (a) of this section, a person shall be imprisoned in the state penitentiary not more than five (5) years."

the appellant relies upon *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), where the Court held that an indigent plaintiff could not be denied access to the courts in a divorce action simply because he could not afford a filing fee. In *United States v. Kras*, 409 U.S. 434, 442, 93 S.Ct. 631, 636, 34 L.Ed.2d 626 (1973), Justice Blackmun, writing for the Court and discussing *Boddie*, supra, said:

"Boddie was based on the notion that a State cannot deny access simply because of one's poverty to a 'judicial proceeding [that is] *the only effective means of resolving the dispute at hand.*'" (Emphasis added.) 409 U.S. at 443, 93 S.Ct. at 637.

In *Boddie*, the Court said:

" * * * a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard. The State's obligations under the Fourteenth Amendment are not simply generalized ones; rather, the State owes to each individual that process which, in light of the values of a free society, can be characterized as due." 401 U.S. at 380, 91 S.Ct. at 787.

The Court also stated that,

" * * * given the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship, due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." 401 U.S. at 374, 91 S.Ct. at 784.

In holding that the denial of the indigent's access by reason of his inability to pay a filing fee was denial of due process, the Court was careful to observe:

" * * * *The legitimacy of the State's monopoly over techniques of final dispute settlement, even where some are denied access to its use, stands unimpaired where recognized, effective alternatives for the adjustment of differences remain.*" (Emphasis added.) 401 U.S. at 375–376, 91 S.Ct. at 785.

The court then addressed itself to two important due-process principles—namely, the citizen's meaningful opportunity to be heard and the fact that a rule or statute may be constitutionally valid on its face but invalid when applied in those circumstances when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question.

Of the first principle—the meaningful opportunity to be heard—the Court observed that it had long been the law that

" * * * '[w]herever one is assailed in his person or his property, there he may defend.' *Windsor v. McVeigh*, 93 U.S. 274, 277 [23 L.Ed. 914] (1876)." 401 U.S. at 377, 91 S.Ct. at 785. (See 401 U.S. at 377, 91 S.Ct. at 785 for other citations.)

The Court went on to say that the constitution does require—as it contemplates due process—

" * * * 'an *opportunity* ... granted at a meaningful time and in a meaningful manner,' *Armstrong v. Manzo*, 380 U.S. 545, 552 [85 S.Ct. 1187, 1191, 14 L.Ed.2d 62] (1965) (emphasis added), 'for [a] hearing appropriate to the nature of the case,' *Mullane v. Central Hanover Tr. Co.*, supra [339 U.S. 306] at 313 [70 S.Ct. 652 at 657, 94 L.Ed. 865]. The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event. In short, 'within the limits of practicability,' id., at 318 [70 S.Ct. at 659], a State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." 401 U.S. at 378–379, 91 S.Ct. at 786.

We have held that a fair judicial system requires notice and an opportunity to defend. *State ex rel. Blonder v. Goodbrod*, 77 Wyo. 126, 307 P.2d 1073, 1075 (1957). We said in *White v. Board of Trustees of Western Wyoming Community College District*, Wyo., 648 P.2d 528, 535 (1982):

"What procedures constitute due process have been frequently discussed by the United States Supreme Court. In fact it has concluded that:

" 'Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379 [91 S.Ct. 780, 786, 28 L.Ed.2d 113]. "While '[m]any controversies have raged about * * * the Due Process Clause,' * * * it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate [a protected] interest * * *, it must afford 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." *Bell v. Burson*, 402 U.S. 535, 542 [91 S.Ct. 1586, 1591, 29 L.Ed.2d 90]. * * *' *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570, fn. 7, 92 S.Ct. 2701, 2705, fn. 7, 33 L.Ed.2d 548 (1972)."

The deprivation of due process found to be present in Boddie is not present in the case at bar. Here, the jury fee was not paid by the presumed-indigent respondent but he was not thereby denied access to the courts as was the divorce plaintiff in Boddie. In that case, the plaintiff could not get into court without the fee. Here, LP was in court after having waived his statutory right to a jury trial, the consequence of which did not, however, deprive him of his right to fully litigate his claim before a competent fact-finder. Therefore he was furnished the required due-process hearing before deprivation of his fundamental liberty to associate with his family was imposed.

■ We hold, then, that the right to a jury trial in a parental-termination action cannot be characterized as fundamental. Neither the Federal nor the State Constitutions secure a jury trial in this civil action. The Seventh Amendment to the Federal Constitution is not incorporated into the Fourteenth Amendment and is not applicable to state court proceedings. *Colgrove v. Battin*, 413 U.S. 149, 160, 93 S.Ct. 2448, 2454, 37 L.Ed.2d 522 (1973); *Walker v. Sauvinet*, 92 U.S. 90, 92–93, 23 L.Ed. 678 (1875); *State v. Palko*, 122 Conn. 529, 191 A. 320, 326, aff'd, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288, overruled in part, on other grounds, in *Benton v. Maryland*, 395 U.S. 784, 793, 89 S.Ct. 2056, 2061, 23 L.Ed.2d 707 (1937). *Bringe v. Collins*, 274 Md. 338, 335 A.2d 670, 675 (1975).

LP, in the case at bar, has been furnished the "meaningful opportunity to be heard" which the Boddie case requires. It was said in *McKeiver v. Pennsylvania*, 403 U.S. 528, 543, 91 S.Ct. 1976, 1985, 29 L.Ed.2d 647 (1971):

" * * * [O]ne cannot say that in our legal system the jury is a necessary component of accurate factfinding. * * * Juries are not required, and have not been, for example, in equity cases, in workmen's compensation, in probate or in deportation cases."

Unlike the situation in *Boddie*, the appellant here can point to no fundamental interest which he has lost by reason of the unavailability of a jury to hear his case. His constitutional position has not been altered or affected by the court's refusal to grant the jury demand, it having been waived in the first instance. His case was heard by a competent fact-finder and for the reasons set out herein, the trial court did not err in denying the appellant a jury trial.

## ISSUE NO. 2

### The Refusal to Order a Physical Examination of GP

The appellee alleges that appellant abused GP, his eight-year-old daughter by

having "sexual intercourse" with her.[5] In buttressing his denial of this charge, LP, whose indigency had been acknowledged by the court, argues that it was error to refuse his request for funds with which to pay an expert witness to examine GP.

The appellant's motion requested:

"Costs associated with the retention of a qualified physician to examine and test [SP] and [GP], to determine prior sexual activity, and to explain the physiological responses of children submitted to the types of incidences which are alleged in this case, and to explain other possibilities for any redness or abnormal condition of the vaginal area as alleged in this case."

Following oral argument, the trial court denied appellant's motion.

It was LP's contention that even though § 14-3-202(a)(ii) defined "abuse" to include "the commission * * * of a sexual offense against a child," he had a right to defend against the specific allegation of having had "sexual intercourse" since this is the sexual offense which DPASS said it was going to prove, and its answers to interrogatories did not indicate reliance upon any other type of abusive conduct as having been visited by LP upon his daughter, GP. It was the respondent's theory that a physical examination of the young girl would reveal whether the hymen had been ruptured,

"* * * and if not, the significance of that physical evidence to the respondent's defense; that is, that if the hymen were not broken, the allegations of the petitioner would be shown to be a virtual impossibility."

At the time of the trial of the issues in this case, the attorney for DPASS called Nancy Clizbe Johnson, who was employed at the Wyoming State Children's Home when LP's children were in that institution's care. At one point in the proceedings, this witness testified:

"* * * [S]he [GP] also told me she had done it before with [LP]. She stated that in February of 1980 on a Saturday when her mother was at work, sometime in the evening [LP] made her come to his bedroom and he took her nightgown off and that he pulled down his pants, and she stated that he stuck his thing in her. She said it hurt a little, and she didn't like it, she also said that it happened again, I believe, the next day, and that her mother had caught him, and that was when her mother, [SP], had kicked [LP] out of the house."

On the other hand, GP testified that LP never hurt her, and that he spanked her once "on the bottom." Nancy Johnson also testified that GP had told her that no one had ever touched her in the vaginal area as it would hurt and that she knew a lot about sex.

The condition of the record with respect to the sexual abuse which LP is alleged to have visited upon GP is that Nancy Johnson testified that GP told her (1) that LP had "sexual intercourse" with her on two occasions, and (2) that no one had ever touched her in the vaginal area.

Assuming for purposes of discussion that this inconsistent testimony is admissible, over hearsay objection, it behooves this court to accept as true the evidence of the successful party, leave out of consideration the evidence of the unsuccessful party in conflict therewith, and give the evidence of the successful party every favorable inference which may fairly and reasonably be drawn therefrom. *DS v. Department of Public Assistance and Social Services*, supra. This means that we must approach the issue raised by the court's denial of the motion to have GP examined from the point of view that the only evidence which we

---

5. In answer to the interrogatory:

"Please state with particularity the date, time, and place of each alleged incident of abuse, of any or any combination of the children, by [LP],"

DPASS responded:

"* * * In the late part of February, 1980, [LP] had sexual intercourse with [GP]."

may consider is to the effect that LP in fact twice had sexual intercourse with GP.

In furtherance of respondent-appellant's contention that the court should have made funds available for an examination of GP, Dr. Krause, who is an associate professor with the University of Wyoming Family Practice Training Center, was called. His qualifications were not questioned and he testified as follows:

"Q. Do you have an opinion as to whether the hymeneal ring in an eight year-old girl would be broken if an adult male had sexual intercourse with her?

"MISS THORNTON: Objection, lack of foundation.

"THE COURT: I will overrule the objection. * * *

"A. Yes, I have an opinion.

"Q. And what is that opinion?

"A. The opinion would be that there would be evidence of injury in an 8-year old girl if an adult male had intercourse, sexual intercourse with her.

"Q. And what type of injury would that be?

"A. There would be injury to the hymeneal ring.

"Q. Okay. Do you have an opinion as to whether a physical examination of that same girl would reveal that injury?

"A. Yes.

"Q. And do you have an opinion—what is that opinion?

"A. That the injury would be evidence.

"Q. Okay. Do you have an opinion as to whether a physical examination of that same girl three years later would reveal if the hymeneal ring had been injured?

"A. It would still be evidence."

There was no impeachment of this testimony and therefore this record as regards GP stands for the following proposition: The allegation of abuse with which LP stands charged is having "sexual intercourse" with his eight-year-old daughter—that an examination could have shown that the child had never had "sexual intercourse." From this, LP argues that—if it is true, as Dr. Krause says, that prior "sexual intercourse" could have been detected at the time of the requested examination, then it follows that the denial of the respondent's motion resulted in foreclosing his defense from such evidence as could have exonerated him of the abuse which it is alleged he committed against GP. In these circumstances, the respondent concludes that this denial resulted in a violation of his constitutional rights of due process. *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981), and *Bowen v. Eyman,* D.Ariz., 324 F.Supp. 339 (1970), discussed in detail infra.

It was the guardian ad litem's position at the hearing on the motion that

(a) "the examination would be emotionally and psychologically dangerous and/or damaging to the child," and

(b) "that an exam would be improper because the physical condition of GP was not in controversy." [6]

The appellant, in reply, relied upon Rule 35, W.R.C.P.,[7] asserting that GP was either a party or the "person in the custody or under the legal control of a party [DPASS],"

" * * * and that the allegations of D-PASS with respect to [GP]'s prior sexual conduct with the respondent and the respondent's denial of such sexual conduct,

---

**6.** The quotation is from the respondent-appellant's "STATEMENT OF PROCEEDING" which was made a part of the record at the trial level.

**7.** Rule 35, W.R.C.P. provides:
"Physical and mental examination of persons.
"(a) *Order for examination.*—When the mental or physical condition (including the blood group) of a party, *or of a person in the custody or under the legal control of a party,* [emphasis added] is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made."

placed her physical condition in controversy." [8]

There was no showing in this record that the emotional or psychological effect of an examination would be damaging to the child, and it is true as asserted by LP that the physical condition of GP ("a person in the custody or under the legal control of a party," i.e., DPASS) was in controversy within the meaning of Rule 35, W.R.C.P., supra n. 7.

The appellee bases its entire medico-physical fact argument on authorities which hold that proof of rape can be accomplished by showing the physical condition of the victim soon after the outrage,

> " * * * although evidence of the physical condition of the prosecutrix several months after the commission of the offense has been held too remote to throw light on the issues in the case." 65 Am Jur 2d, Rape § 63, p. 797.

■ The appellee relies upon such statutory authority as is exemplified by § 6–2–309(f), W.S.1977, which provides:

> "If a report of the alleged sexual assault is received more than ten (10) days after the alleged incident, the medical examination shall not be mandatory."

The quoted American Jurisprudence 2d rule and the statute simply identify the time limitations beyond which medical evidence from the usual rape victim becomes remote and thus so speculative that it no longer accomplishes the purpose for which it was designed. These doctrines are intended to protect the rape defendant from testimony which is elicited through unreliable medical evidence and it can hardly be said that they are calculated to serve as a bar to the citizen accused from pursuing exonerating evidence which, in turn, insures his receiving such fair trial as is contemplated by the due-process clauses of the federal and state constitutions. The constitutional aspects of these rights are highlighted when it is remembered that this court has held that the right to associate with one's family and to have custody of a minor child is a fundamental right, *DS v. Department of Public Assistance and Social Services,* supra. Due-process considerations are, therefore, paramount in a termination-of-parental-rights proceeding.

But, we think that the appellee misses the entire point for which the appellant contends. The logic of appellant's request must necessarily lie in the existence or nonexistence of acknowledged medical facts as tested against known and accepted medical and legal propositions. The appellee's objection to the physical examination must be able to overcome any such facts and assumptions.

*The medical propositions are these:* If it is a medical fact that the hymen of an eight-year-old girl would necessarily be torn or ruptured by "sexual intercourse" (*as that term is contemplated in law*) and would not repair itself either at any time at all or, at least, in the period of time between the alleged intrusions and the examination, then the presence and condition of the child's hymen and the associated area is tellingly relevant to LP's defense to the charge of having had sexual intercourse with her. This would be so because, if, upon examination, the hymen were found to be intact and the expert testimony was that this could not be its condition had "sexual intercourse" occurred, and if it were further to be shown that "sexual intercourse" in medicine and "sexual intercourse" in law mean the same thing, then the factfinder would be forced to the conclusion that the accused had not engaged in intercourse with the girl—an exonerating conclusion. On the other hand, if it were shown to be a medical fact that a child's vagina *could have been penetrated* through "sexual intercourse" without leaving evidence of rupture of the hymen tissues—and an examination were to find the hymen without rupture or tear—then the examination would not *necessarily* prove favorable to the accused. The third possibility is that the medical testimony might be that the hymen could be found to be ruptured but that this could occur through

---

**8.** Respondent's "STATEMENT OF PROCEED- INGS", supra n. 6.

some trauma or intrusion other than intercourse.

However, of these three possibilities, the respondent argues that it would clearly be weighty, in behalf of his defense to the accusation that he had abused GP by having intercourse with her, if medical evidence were to show that

(a) "sexual intercourse," as described by Dr. Krause, could not have occurred without the hymen being ruptured, no matter how long after the event, and

(b) the hymen was still in place and without rupture as long as a year or two after the alleged intrusion.

■■■ Due process requires expenditure of public monies for tests performed by a defense expert where those tests could exclude a defendant as the guilty party. *Bowen v. Eyman,* supra, 324 F.Supp. 339. In *Bowen,* the court said:

"Petitioner, an indigent, was tried and convicted of rape and robbery. Prior to trial, he moved, without success, for a court-appointed expert to test the seminal fluid removed from the vaginal tract of the victim and petitioner's blood for the purpose of excluding petitioner as the perpetrator of the rape. *That a comparison of the blood types could have negated guilt is not disputed herein and is supported by ample authority.* See, e.g., *State v. Bowen,* supra [104 Ariz. 138, 449 P.2d] at 605; *People v. Kemp,* 55 Cal.2d 458, 359 P.2d 913, 924, 11 Cal.Rptr. 361, cert. denied, 368 U.S. 932, 82 S.Ct. 359, 7 L.Ed.2d 194 (1961); see also 1 J. Wigmore, Evidence §§ 165a–b (3d ed. 1940).

"Cases concerning the right to a court-appointed expert at public expense are few in number, but, on various constitutional grounds, courts have increasingly recognized such a right. E.g., *Davis v. United States,* 413 F.2d 1226 (5th Cir. 1969) (dictum); *Watson v. Patterson,* 358 F.2d 297 (10th Cir.), cert. denied, 385 U.S. 876, 87 S.Ct. 153, 17 L.Ed.2d 103 (1966); *Bush v. McCullom,* 231 F.Supp. 560 (N.D.Tex.1964), aff'd, 344 F.2d 672 (5th Cir.1965); *People v. Watson,* 36 Ill.2d

228, 221 N.E.2d 645 (1966); *State v. Second Jud. Dist. Ct.,* 85 Nev. 241, 453 P.2d 421 (1969); *State v. Green,* 55 N.J. 13, 258 A.2d 889 (1969); see Report of Attorney General's Committee on Poverty and the Administration of Criminal Justice 12 (1963). In the Court's view, 'fundamental fairness' is the touchstone, i.e., whether or not a defendant is entitled to a court-appointed expert depends on the facts and circumstances of the case. And *there can be no doubt that in this case, where tests could have been run which might have excluded petitioner as the guilty party, fundamental fairness was not accorded the petitioner in refusing to appoint an expert.* See *People v. Bynon,* 146 Cal.App.2d 7, 303 P.2d 75 (1956). Furthermore, since the state could have tested petitioner's blood as well as the fluid extracted from the victim's vagina, see, e.g., *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Newhouse v. Misterly,* 415 F.2d 514 (9th Cir.1969), cert. denied, 397 U.S. 966, 90 S.Ct. 1001, 25 L.Ed.2d 258 (1970), and thus itself excluded petitioner as the rapist, *its refusal to run the tests is tantamount to a suppression of evidence such as there was in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and a deprivation of due process.* Accordingly, the Court holds that petitioner was denied due process of law by the trial court's failure to grant his motion to appoint an expert at state expense to perform blood tests or by the state's failure to independently conduct such tests." (Emphasis added.) 324 F.Supp. at 340.

In *Little v. Streater,* supra, 452 U.S. at 12, 101 S.Ct. at 2208 (where in paternity litigation the putative, indigent father was refused costs for blood tests), Chief Justice Burger, speaking for a unanimous Court, said:

" * * * [I]t [the denial of the blood test] in effect forecloses what is potentially a conclusive means for an indigent defendant to surmount that dis-

*parity and exonerate himself. Such a practice is irreconcilable with the command of the Due Process Clause."* (Emphasis added.)

In *Lassiter v. Department of Social Services,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–2159, 68 L.Ed.2d 640 (1981), the United States Supreme Court observed:

"For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. '[U]nlike some legal rules,' this Court has said, due process 'is not a technical conception with a fixed content unrelated to time, place and circumstances,' *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 6 L.Ed.2d 1230, 81 S.Ct. 1743 [1748]. Rather, the phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake."

The respondent argues that his case is like *Bowen v. Eyman,* supra, and *Little v. Streater,* supra, where, as announced in Bowen, the rule is:

" * * * [W]here tests could have been run which might have excluded petitioner as the guilty party, fundamental fairness was not accorded the petitioner in refusing to appoint an expert." 324 F.Supp. at 340.

and its refusal to run the test (according to *Bowen v. Eyman,* supra),

" * * * is tantamount to a suppression of evidence such as there was in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and a deprivation of due process." 324 F.Supp. at 340.

The rule of Bowen and Little would apply in the case at bar only if the test could have exonerated the respondent from the charge of having sexual intercourse with his daughter, GP.

The question for decision is: Would the examination have exonerated LP had the hymen been found to be intact? We think it would not have exonerated him and therefore his due-process rights were not violated.

We hold that the court did not commit error when it held that the State would not pay for the medical examination in question.

The key to the solution lies in our interpreting the meaning of the term "sexual intercourse," because the abuse with which LP is charged is having "sexual intercourse" with GP. In answer to the question,

"Do you have an opinion as to whether the hymeneal ring in an eight year-old girl would be broken if an adult male had sexual intercourse with her?",

Dr. Krause said he did have an opinion and that his opinion would be

" * * * that there would be evidence of injury in an 8-year old girl if an adult male had intercourse, sexual intercourse with her."

It is, of course, evident beyond contradiction that the answer presupposes contact between the male penis and the female hymen. In other words, the doctor's answer, in a medical context, assumes such penetration as would result in contact with that membrane or at least the area where the hymeneal ring is located in the body of GP. It is true that, in order that "sexual intercourse" be effected in the legal sense there must be penetration "of the genital organs of the female." *State v. Hines,* 79 Wyo. 65, 74, 331 P.2d 605 (1958). However, "sexual intercourse" within the contemplation of this rule of law does not necessarily assume that degree of penetration which is contemplated by the medical testimony in this case. It was said in *State v. Murry,* 277 N.C. 197, 176 S.E.2d 738, 742 (1970):

" 'The terms "carnal knowledge" and "sexual intercourse" are synonymous. There is "carnal knowledge" or "sexual intercourse" in a legal sense if there is the slightest penetration of the sexual

organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient. G.S. § 14–23; *State v. Monds*, 130 N.C. 697, 41 S.E. 789; *State v. Hargrave*, 65 N.C. 466; *State v. Storkey*, 63 N.C. 7; Burdick: Law of Crime, section 477; 44 Am.Jur., Rape, section 3; 52 C.J., Rape, sections 23, 24.' *State v. Bowman*, 232 N.C. 374, 61 S.E.2d 107; *State v. Jones*, 249 N.C. 134, 105 S.E.2d 513."

See to the same effect *Walker v. State*, 197 Tenn. 452, 273 S.W.2d 707 (1954), citing and quoting the North Carolina Supreme Court in *State v. Bowman*, 232 N.C. 374, 61 S.E.2d 107, 108 (1950).

In *State v. Wilson*, 32 Wyo. 37, 228 P. 803 (1924), where the defendant was charged with an assault with intent to have carnal knowledge (intercourse), we held that penetration "though to no particular depth" must be proved, thereby holding with the sense of the previously quoted cases to the effect that it is possible, in law, to have carnal knowledge ("sexual intercourse") given the slightest degree of penetration. This means that a man charged with having sexual intercourse with a female child could, in the legal sense, accomplish the act without doing such violence to the hymeneal ring as was contemplated by the testimony of Dr. Krause.

We again acknowledged the aforesaid legal definition of "sexual intercourse" when we approved, in *Kennedy v. State*, Wyo., 470 P.2d 372, 376 (1970) the following instruction in a rape case:

" 'YOU ARE INSTRUCTED there is "carnal knowledge" if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered; the entering of the vulva or labia is sufficient. Proof of emission is not required.' "

We are, then, brought to this conclusion:

◼ The trial court did not err in denying respondent's motion for costs to examine GP because even if the examination would have revealed no rupture or trauma to the hymeneal area—a factor which would serve to deny sexual intercourse under Dr. Krause's medical testimony—*from the legal point of view*, this physical evidence would not mean that the respondent had not engaged in sexual intercourse with GP.

Sexual intercourse, as defined in law, can be accomplished with less penetration than that degree to which Dr. Krause testified, and therefore the examination would not have absolved the respondent of having had sexual intercourse with GP.

ISSUE NO. 3

The Refusal of the Trial Court to Allow Testimony Concerning Appellee's Pre-Termination Procedures

This portion of the appeal raises questions concerning tendered but rejected offer-of-proof testimony to the effect that DPASS failed to comply with its own procedural rules in deciding to seek termination of appellant's parental rights.

At trial, the attorney for appellant sought to elicit from Kathleen Petersen, a family community services specialist with Natrona County DPASS, testimony concerning the usual procedural process followed by the agency in terminating parental rights. Upon objection by appellee's attorney, the trial court excluded this line of questioning for the reason that the testimony was not relevant to the issues. Appellant's attorney then made the following offer of proof:

"MR. HENLEY: Your Honor, we would like to make an offer of proof on this. We would ask Mrs. Petersen if D–PASS had a usual procedure by which they terminate parental rights, she would have responded, yes, when part of that procedure was having what is called a parental permanency—

"MISS THORNTON: Permanency Planning Team meeting.

"MR. HENLEY: Planning Team meeting, and we would have asked Mrs. Petersen what the Permanency Planning Team meeting was all about, she would have stated they had reviewed the records of D–PASS, we would have asked who was on the Permanency Planning Team, we believe she would have answered that at least one person from outside the agency was on the Permanency Planning Team. We would have asked why that person was on the Permanency Planning Team, we believe that she would have answered that it operated, that person operated as an internal control, and as a check on the system, and in the reviewing of the records to make sure that obvious discrepancies, obvious misstatements of fact were not considered by the Agency when they made the decision to terminate, and that that individual person would also have been on the Permanency Planning Team and could have pointed out other causes for particular behaviors, which are evidenced in the children, which might influence the Permanency Planning Team's decision to terminate our client's rights. We would have asked if a Permanency Planning Team meeting were held in this case, we believe she would have answered that there was not one held. And that is our offer of proof."

It is appellant's position that the offered testimony was relevant to show whether certain constitutional protections had been abridged by DPASS in reaching its decision to terminate his parental rights. Appellant asserts that the failure of Natrona County DPASS to abide by its regular termination procedures would constitute a violation of his rights to due process and equal protection under the United States and Wyoming Constitutions.

The procedural rules to which appellant has reference were not made a part of this record, but we are entitled to take judicial notice of them. *Yeik v. Department of Revenue and Taxation,* Wyo., 595 P.2d 965

(1979). We obtained from the Wyoming Department of Health and Social Services a copy of Volume III of the Social Services Manual containing those provisions which, at the time pertinent here, were relevant to foster care services for children. In addition, we obtained from the Secretary of State [10] a certified copy of Chapter V, entitled Foster Care, of the rules and regulations adopted by the State Department of Health and Social Services, which rules went into effect on November 17, 1982, after Natrona County DPASS had filed its petition to terminate appellant's parental rights.

Section 1076.31 of Volume III of the Social Services Manual (July, 1981 revision) contains the following directive with respect to periodic reviews of children in foster care:

"1076.31 Contacts and Reviews

"Continuing services to children in foster care include at least monthly contact with the child, ongoing effort to work with the natural parents so long as parental rights have not been terminated. Review of the progress of the child in foster care and progress towards the goals established in the case plan developed at placement * * * should be made at six-month intervals for foster care. Six-month reviews shall be made in the format of a staffing and shall include at least one person who is not responsible for the case management of or the delivery of services to the child or the parents. The review shall be open to the participation of the parents and they should be notified in writing of the scheduled review. * * * "

Chapter V of the state DPASS rules and regulations provides for periodic reviews as follows:

"Section 11. *Reviews.*

"a. Each child in foster care shall be reviewed at six-month intervals. The review shall be conducted by a team including at least one person who is not responsible for the management or delivery of

---

**10.** The Secretary of State is the official registrar of rules promulgated by state agencies. Wyo- ming Administrative Procedure Act, § 16–3–104, W.S.1977.

services to the child or parent. Parental participation in the review shall be sought. The review shall include:

"(1) Progress the child is making while in care.

"(2) Progress of parents toward reuniting the family.

"(3) Short-term goals for parents and child.

"(4) Long-term goals for reuniting family or developing a permanent plan for the child.

"b. A copy of each review shall be forwarded to SD–PASS and to the court of competent jurisdiction."

The manual provision is substantially similar to the subsequently promulgated agency rule. However, the rule was adopted pursuant to the rulemaking procedure set out in §§ 16–3–102 through 16–3–104, W.S.

**11.** The director of the State Department of Health and Social Services has certified that the rules in Chapter V, relating to foster care, were adopted in accordance with the requirements of the Wyoming Administrative Procedure Act.

**12.** Section 16–3–103, W.S.1977, provides in pertinent part:

"(a) Prior to an agency's adoption, amendment or repeal of all rules other than interpretative rules or statements of general policy, the agency shall:

"(i) Give at least thirty (30) days notice of its intended action. The notice shall include a statement of either the terms or substance of the proposed rule or a description of the subjects and issues involved and of the time when, the place where and the manner in which interested persons may present their views on the intended action. Notice shall be mailed to all persons making timely requests of the agency for advanced notice of its rulemaking proceedings and to the attorney general and the legislative service office if a state agency;

"(ii) Afford all interested persons reasonable opportunity to submit data, views or arguments, orally or in writing. In the case of substantive rules, opportunity for oral hearing must be granted if requested by twenty-five (25) persons, or by a governmental subdivision, or by an association having not less than twenty-five (25) members. The agency shall consider fully all written and oral submissions respecting the proposed rule. Upon adoption of the rule, the agency, if requested to do so by an interested person, either prior to adoption or within thirty (30) days thereafter, shall issue a concise statement of the prin-

1977 of the Wyoming Administrative Procedure Act,[11] whereas the manual provision was not subjected to this formal process.

Under § 16–3–103, *all* administrative rules, other than interpretative rules or statements of general policy, are to be adopted in accordance with the rulemaking process set out in the Wyoming Administrative Procedure Act.[12] Thus, all rules which establish an agency's procedures must be duly adopted pursuant to § 16–3–103. In addition, § 16–3–102(a)(i) directs agencies to adopt rules establishing informal as well as formal procedures available in connection with contested cases.[13] When properly promulgated and adopted by an agency pursuant to statutory authority, such rules have the force and effect of law. *Yeik v. Department of Revenue and Taxation*, supra, 595 P.2d at 968.

cipal reasons for overruling the consideration urged against its adoption.

\* \* \* \* \* \*

"(c) No rule is valid unless submitted, filed and adopted in substantial compliance with this section. A proceeding to contest any rule on the ground of noncompliance with the procedural requirements of this section must be commenced within two (2) years from the effective date of the rule.

"(d) No state agency rule or any amendment, repeal, modification or revision of the rule may be filed with the registrar of rules unless the rule has been submitted to the governor for review and the governor has approved and signed the rule. The governor shall not approve any rule or any amendment, repeal, modification or revision of the rule unless it:

"(i) Is within the scope of the statutory authority delegated to the adopting agency;

"(ii) Appears to be within the scope of the legislative purpose of the statutory authority; and

"(iii) Has been adopted in compliance with the procedural requirements of this act [§§ 16–3–101 through 16–3–115]. For the purposes of this subsection, an 'agency' means any authority, bureau, board, commission, department, division, officer or employee of the state, excluding the state legislature and the judiciary."

**13.** Section 16–3–102(a)(i), W.S.1977, provides:

"(a) In addition to other rulemaking requirements imposed by law, each agency shall:

"(i) Adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available in connection with contested cases; \* \* \*."

In compliance with §§ 16–3–102(a)(i) and 16–3–103, supra, the state DPASS formally adopted review procedures for children in foster care. Prior to the date that these procedures became effective, however, the state DPASS had incorporated into its Social Services Manual similar procedures for review of children in foster care. Since the pertinent manual provision predated the formal adoption of the review process, the manual provision cannot be designated a "procedure" within the meaning of the Wyoming Administrative Procedure Act. This fact, however, is not determinative of the legal effect of the manual directive concerning review of children in foster care.

In attempting to determine the legal effect of the pertinent manual provision, we must examine its content, impact and purpose. Section 1076.31, supra, announced an expanded review process in July, 1981,[14] which process provided for the involvement of parents and persons outside of the agency. This new procedure required each county DPASS to set up properly constituted review teams and to solicit the participation of the parents. By updating its manual pending the adoption of the formal rules, the state agency furnished guidance to the county DPASS personnel, thereby enabling them to become accustomed to the new requirements.

As a guideline to or an interpretation of the subsequently promulgated agency rules, the manual provision did not have the force of law and was not legally binding upon Natrona County DPASS. Schwartz, Administrative Law, § 59, pp. 160–161 (1976); 2 Davis, Administrative Law Treatise, § 7:21, pp. 99–105 (2d Ed. 1979). In reviewing a comparable agency directive, the Sixth Circuit in *Modern Plastics Corporation v. McCulloch*, 400 F.2d 14, 19 (6th Cir.1968), held that a National Labor Relations Board statement of procedure was a "guideline" and, as such, did not bind the agency in a prehearing investigation:

"* * * [T]he statement of procedure is simply a guideline for Board personnel; it does not constitute formal rules or regulations that could appropriately serve as a standard binding the Board to a particular form of prehearing investigation in every case."

See also *National Labor Relations Board v. Monsanto Chemical Company*, 205 F.2d 763, 764 (8th Cir.1953). We hold, then, that Natrona County DPASS was not bound by the interpretative rule or guideline in the Social Services Manual, since the guideline was not the equivalent of a duly promulgated rule or regulation having the force of law. *Yeik v. Department of Revenue and Taxation*, supra.

Appellant asserts, however, that the failure of DPASS to follow its review procedures deprived him of his constitutional rights to due process and equal protection. We cannot agree. Appellant was afforded a full trial before the district court. He received the assistance of an appointed counsel, and the State was required to prove the allegations against him by clear and convincing evidence. Thus, appellant was afforded all of the safeguards provided by Wyoming's parental-rights-termination statutes. These safeguards meet or exceed those mandated by constitutional due process. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, 603 (1982); *Lassiter v. Department of Social Services*, supra; *DS v. Department of Public Assistance and Social Services*, supra. Accordingly, we hold that the failure of DPASS to abide by the review provisions set out in the Social Services Manual was not a relevant issue in appellant's parental-rights-termination pro-

---

**14.** The Social Services Manual provided for the following review procedure between July, 1979, and July, 1981:

"1076.3 *Continuing Services*

"Continuing services to children in foster care include at least monthly contact with the child, ongoing effort to work with the natural parents so long as parental rights have not been terminated. Review of the progress of the child in foster care and progress towards the goals established at placement should be made at six-month intervals for foster care."

ceeding and the district court committed no error in refusing to allow such testimony.

### ISSUES NOS. 4 THROUGH 7

The Admissibility of the Evidence Under Exceptions to the Hearsay Rule

*Records of the Wyoming State Children's Home*

During the trial, various records of the Wyoming State Children's Home, consisting of medical reports, progress notes made by the caseworkers, general observations by the houseparents, and behavior books containing the houseparents' notations of their daily observations of each child were received as evidence. These records were admitted into evidence pursuant to Rule 803(6), W.R.E., the hearsay exception for records of a regularly conducted activity. Rule 803(6) provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * * * * *

"(6) *Records of regularly conducted activity.*—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit; * * *."

Appellant contends that the source of the information in the admitted records as well as the method and circumstances of their preparation indicate a lack of trustworthiness and that, therefore, the records are inadmissible under Rule 803(6). Appellant points out that much of the factual information in the records was supplied by the children, rather than employees of the State Children's Home. Rule 803(6) permits records to be admitted into evidence only when each person who contributed to the preparation of the particular record acted in the routine of the business. *United States v. Plum*, 558 F.2d 568, 572 (10th Cir.1977), cert. denied 441 U.S. 910; 4 Louisell and Mueller, Federal Evidence, § 446, p. 655 (1980).[15] This requirement assures that the records are sufficiently trustworthy to be useful at trial. However, to the extent that the records were received to prove that the children actually made such statements, rather than to prove the truth of the matters asserted, the records retain the trustworthiness inherent in any regularly kept business records. *United States v. Lieberman*, 637 F.2d 95, 99–101 (2nd Cir.1980); Louisell and Mueller, supra, § 448, pp. 683–684.

■ The houseparents and caseworkers recorded in the regular course of their business the statements made by the children. These statements were recorded daily by the employees of the State Children's Home who had actually heard the children say the words. Therefore, the records admitted into evidence are competent to show the vocabulary of the children and the concepts they were able to articulate. We hold that, although the records were not sufficiently trustworthy to prove the truth of the children's statements contained therein (unless the statements are deemed trustworthy by reason of their falling within some other exception to the hearsay rule), the State Children's Home records were admissible to prove that the children actually made the statements.

---

**15.** Since the Wyoming Rules of Evidence which we will consider in this opinion are identical to their federal counterparts, authority interpreting the federal rules is relevant to our application of the Wyoming rules. *Hicklin v. State,* Wyo., 535 P.2d 743, 748 (1975).

Appellant further contends that the State Children's Home records are untrustworthy because they are incomplete. In particular, appellant points out that the behavior book covering March 1, through April 4, 1980, and the houseparents' book from November 24, 1981, to the end of the children's stay were not located. Furthermore, certain pages and portions of pages had been removed from the spiral notebooks.

Without question, the complete records, unmarred by torn pages and missing segments, would have been more useful to the trial court than those records actually admitted. However, such discrepancies go to the weight rather than to the admissibility of the evidence. So long as the available records satisfied all of the safeguards set out in Rule 803(6), we cannot say that the trial court abused its discretion in admitting them into evidence.

In a related situation, the Seventh Circuit upheld the receipt of an appointment book against charges that nonsequential and possibly noncontemporaneous entries impugned the trustworthiness of the entire book. The court ruled that irregularities of this sort did not undermine the integrity of the records as a whole:

> " * * * We do not however agree with the defendants that nonsequential entries preclude admissibility as business records. * * * As long as the entries satisfy the contemporaneity and regularity requirements, their sequence is irrelevant. * * * [T]here is no reason to require that an appointment calendar remain a 'static document'; indeed as appointments and other matters change the calendar to be useful must be nonsequentially revised. The only requirement is that these revisions be contemporaneous and regular * * *. However, even if several of the entries were made non-contemporaneously, it remains within the district court's discretion to determine whether the few non-contemporaneous entries so undermine the reliability of the record as to preclude admissibility. Given that there were only fifteen non-se-

quential entries over a two year period, even if many of these were shown to be non-contemporaneous, we could not say that this discretion was abused." *United States v. McPartlin*, 595 F.2d 1321, 1348–1349 (7th Cir.1979).

■ In the present case, the records of the State Children's Home which were admitted into evidence are substantially complete. The behavior books show regular entries from April 8, 1980, until December 18, 1981, when the children left the State Children's Home to live with foster families. The notebooks containing the housemothers' general observations are complete from May 5, 1980, to August 3, 1981. Therefore, the trial court did not abuse its discretion in concluding that the unavailability of some portions of the records failed to undermine the reliability of the records which were admitted.

■ Finally, appellant contends that the houseparents' records were untrustworthy because no written rules or regulations governed the making of their notations. The houseparents were merely required to record daily their observations and the remarks made by the children. Appellant objects to the fact that the entries vary widely and were uncontrolled and unindexed. Rule 803(6) does not require that business records be prepared according to formal rules in order to be admissible. Regardless of the method of preparation, the records of a regular business are deemed reliable if they are made routinely for a serious and continuing purpose related to business activities apart from litigation. Louisell and Mueller, supra, § 446, at 647. Assuming, as we do, that the records in the present case assisted the State Children's Home personnel in meeting the continuing needs of those children in its care, we hold that the records were properly admitted under Rule 803(6).

*Hearsay Statements of GP*

At trial Nancy Johnson, the social services manager at the State Children's Home during the time relevant here, was permitted to testify that on April 21, 1980, GP

said that appellant had sexual intercourse with her on two separate occasions in February, 1980. This evidence was offered and received under the "catch-all" exception to the hearsay doctrine, Rule 803(24), W.R.E. That rule provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

"(24) *Other exceptions.*—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

In *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), this court considered the requirements for admissibility of hearsay evidence under Rule 804(b)(6), W.R.E., which is identical to Rule 803(24). We observed that these catch-all exceptions were created to allow courts additional flexibility in admitting hearsay. We then went on to say:

"These exceptions are designed to allow trustworthy hearsay into evidence *but* only when it is both in fact worthy of trust and necessary to effectuate justice." 632 P.2d at 130.

Based on pertinent federal case law and our own reading of Rule 804(b)(6), we set out six requirements for admissibility:

" \* \* \* First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness; this may be established either through other corroborating evidence or by considering the motivation and/or behavior pattern of the declarant." 632 P.2d at 131–132.

Only the fifth requirement—that the evidence be trustworthy—concerns us here. The first requirement is inapplicable since we are concerned with Rule 803(24) which permits the use of hearsay evidence even though the declarant is available as a witness. Appellant does not argue that the other conditions of Rule 803(24) were not met. His position is that the hearsay evidence lacks circumstantial guarantees of trustworthiness since no corroborating evidence exists and since the behavior pattern of GP refutes the reliability of the testimony. We agree.

The hearsay statement represents the only allegation in the record that appellant molested GP. GP testified at trial that LP had not hurt her and had never undressed her. Furthermore, the State Children's Home records indicate that GP had previously denied having sexual contact with appellant in an interview with Nancy Johnson on April 2, 1980. Indeed, the behavior books and progress notes prepared by the State Children's Home employees indicate a general pattern of inconsistent statements on the part of GP.

The Fourth Circuit in *United States v. Hinkson*, 632 F.2d 382 (4th Cir.1980), upheld the trial court's exclusion of evidence offered under Rule 803(24), F.R.E., where the declarant had reason to prevaricate and there was no corroborating evidence:

"The only guarantee of trustworthiness is the fact that [the declarant's] alleged

statement was self-inculpatory. But we deem that insignificant in view of the other evidence and lack of evidence. [The witness] testified that [the declarant] gloried in parading his motorcycle gang member image before his girlfriend's acquaintances. A claim that he killed [the victim], made to a relatively casual acquaintance hundreds of miles from the scene of the killing, would seem to be braggadocio. There was no physical evidence or testimonial evidence to support either the fact that [the declarant] made the statement or that it represented the truth." 632 F.2d at 386. In similar fashion, the record in the instant case is devoid of those guarantees of trustworthiness which the rule requires.

█ We are mindful of the principle that the degree of reliability necessary for admission is greatly reduced where the declarant is testifying and is subject to cross-examination. *United States v. McPartlin,* 595 F.2d 1321, 1350 (7th Cir.1979), cert. denied 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43. This principle, however, is of no significance where, as here, the declarant GP testified that she did not remember discussing embarrassing topics with Nancy Johnson. Under such circumstances, effective cross-examination concerning the hearsay statement is impossible. See *United States v. Swanson,* 572 F.2d 523, 528 (5th Cir.1978), cert. denied 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152. We hold, then, that the court erred in admitting the hearsay testimony of Nancy Johnson that LP engaged in sexual intercourse with GP. Such evidence could not properly be considered in terminating the parental rights of appellant with respect to GP.

*Hearsay Statements of JP*

Walter Murray, a deputy prosecutor for Natrona County, testified at trial that JP said that he saw appellant fondle the genital area of GP. Ellen Bea Spiva, foster parent to SP and JP after they left the State Children's Home, testified that JP said that while he, LP, LP's wife, and SP were naked, LP had lain on top of his wife and had encouraged JP to touch SP and LP's wife. This evidence was offered and received under the catch-all exception, Rule 803(24), supra. Appellant questions the trustworthiness of these out-of-court statements by JP, given the fact that JP testified at trial that appellant had had sexual intercourse with SP and then admitted on cross-examination that he had not seen this event but that someone at the State Children's Home had told him about it. Appellant further points out that expert medical testimony revealed that SP had never experienced sexual intercourse.

█ We do not believe that JP's equivocal testimony at trial or the evidence refuting the possibility of medical sexual intercourse sufficiently counter the indicia of trustworthiness surrounding these statements so as to preclude their receipt into evidence. JP's statements were corroborated, at least in part, by reliable assertions by SP that appellant had hurt her. See discussion infra. The tenor of JP's statements remained consistent over a period of several months and he never retracted his version of these events. He was five and six years old at the times that the statements were made, a fact which supports our finding of candor and absence of motivation to falsify. We conclude that the foregoing factors supply the circumstantial guarantees of trustworthiness contemplated by Rule 803(24) and the standards set out in *Hopkinson v. State,* supra, and that the statements by JP to Walter Murray and Ellen Bea Spiva were properly received into evidence.

Appellant also objects to the testimony by Nancy Johnson, social services manager at the State Children's Home, that, following a home visit in April, 1980, JP said that his dad had gotten made and had hit him with an Easter bucket. We will hold that this statement, in the context in which it was used at trial, does not fall within the definition of hearsay evidence and, therefore, was properly admitted. Rule 801, W.R.E. defines hearsay and specifies certain statements which are not hearsay. Rule 801(d)(1)(B) provides:

"(d) *Statements which are not hearsay.* —A statement is not hearsay if:

"(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * * *."

JP was the first witness to testify at the parental-rights-termination proceedings. On direct examination he testified that appellant had hit him with an Easter bucket. When questioned about the incident on cross-examination, JP said that he had not been hit with a bucket, but that the "nursery ladies" had told him to say that appellant had struck him. Nancy Johnson testified directly after the testimony of JP. She reported that following a home visit she had questioned JP about bruises on his body, at which time he revealed that appellant had hit him with an Easter bucket.

 So long as a witness is subject to cross-examination concerning an earlier statement which is consistent with his testimony, *any* prior consistent statement may potentially be excluded from the definition of hearsay under Rule 801(d)(1)(B). Louisell and Mueller, supra, § 420, pp. 187, 199. The situation at bar falls directly within the language of the rule. After testifying on direct examination concerning the Easter-bucket incident, JP's testimony was impeached during cross-examination by the charge that the nursery ladies had encouraged him to fabricate the story for trial. Therefore, JP's earlier statement to Nancy Johnson shortly after his visit home, which statement was consistent with his direct testimony, was properly admitted to rebut the suggestion of recent fabrication. See *Garcia v. Watkins*, 604 F.2d 1297, (10th Cir.1979). Once the statement was admissible under Rule 801(d)(1)(B) to rehabilitate JP's direct testimony, his prior statement could also be considered as substantive evidence that appellant had hit him with the bucket. Louisell and Mueller, supra, § 420

at 190. *United States v. Lanier*, 578 F.2d 1246, 1255–1256 (8th Cir.1978), cert. denied 439 U.S. 856, 99 S.Ct. 169, 58 L.Ed.2d 163.

*Hearsay Statements of SP*

 At trial, Barbara Weiss, a housemother employed by the State Children's Home, and Grace Riley, the superintendent of the State Children's Home, testified that following a weekend visit with appellant and his wife in November, 1981, SP complained that appellant had hurt her. We will hold that the testimony of Weiss was properly admitted under Rule 803(2), W.R.E., the "excited utterances" exception to the hearsay doctrine. We will not address, therefore, the propriety of admitting Riley's hearsay evidence which was offered and received under Rule 803(24), since her testimony was substantially similar to that of Weiss and described the same incident.

Weiss testified that she and another housemother were present when appellant and his wife returned the children to the State Children's Home after a Thanksgiving holiday visit. She testified that it was late and that appellant told her that SP had already had her bath. Her testimony continued:

"A. * * * When we were getting [SP] ready to go to bed, we were trying to change her underclothes, which is customary, and get her pajamas on, and she kept squiggling, screaming, got upset and didn't want her clothes on and said it hurt her, and hurt her, I asked her what hurt her, she said my dad hurt me and hurt me here.

"[Objection omitted.]

"A. And finally I asked [SP] what happened, did you fall, did you hurt yourself. Now, this is the best of my memory.

"Q. That is all we can ask.

"A. And she said, no, my daddy hurt me. And I said, did you and [JP] were probably playing and [JP] hurt you, and she said, no, daddy hurt me. She started crying, really upset, and Luanne went and called our supervisor, which was Mrs. Grace Riley at that time."

Rule 803(2), W.R.E., provides the following exception to the hearsay doctrine:

"(2) *Excited utterance.*—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition; * * *."

The rationale behind this exception is that the out-of-court declaration constituted a spontaneous reaction to an exciting event which overpowered the declarant's capacity to reflect and deliberate. Such statements are considered trustworthy because the declarant was rendered, for the moment, incapable of fabrication and because the statement was made while his memory of the event was still fresh. Louisell and Mueller, supra, § 439, pp. 491–492.

In deciding whether a statement properly fits within the excited-utterances exception, courts have considered the nature of the startling event, the declarant's physical manifestations of excitement, his age, the lapse of time between the event and the hearsay statement, and whether the statement was made in response to an inquiry. In *United States v. Iron Shell*, 55 A.L.R.F. 664, 633 F.2d 77 (8th Cir.1980), cert. denied 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203, the Eight Circuit upheld the admission of the out-of-court declaration made by a nine-year-old sexual-assault victim to an investigative officer approximately one hour after the event. Appellant had argued that Lucy, the victim, was no longer under the stress of excitement when she talked to Officer Marshall, that she was quiet and not crying, and that her statements were deliberate answers to an inquiry. In discounting these arguments, the court said:

"The lapse of time between the startling event and the out-of-court statement although relevant is not dispositive in the application of rule 803(2). [Citations.] Nor is it controlling that Lucy's statement. was made in response to an inquiry. [Citations.] Rather, these are factors which the trial court must weigh in determining whether the offered testimony is within the 803(2) exception. Other factors to consider include the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements. In order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation. [Citations.]

"Determination of this issue is a close question. There is testimony that the declarant was calm and unexcited. In contrast the same witness described Lucy as nervous and scared. Testimony from other sources suggested that Lucy had struggled with the defendant, that he had threatened her with serious harm and that he had unsnapped and pulled down her jeans. The stress and fear that such an occurrence would impose upon a young girl cannot be discounted. Officer Marshall testified that Lucy did not give a detailed narrative but spoke in short bursts about the incident. The officer emphasized at trial that she did not ask Lucy suggestive questions but merely reported what Lucy said. The officer only asked Lucy, 'what happened?'

\* \* \* \* \* \*

" * * * The single question 'what happened' has been held not to destroy the excitement necessary to qualify under this exception to the hearsay rule. [Citations.] A lapse of about one hour has also been held not to remove the evidence from the 803(2) exception, especially where the declarant is a young child. [Citations.] * * * It is a truism to state that each of these cases must be decided on its own circumstances. We find that in these circumstances considering the surprise of the assault, its shocking nature and the age of the declarant, it was not an abuse of discretion for the trial court to find that Lucy was still under the stress of the attack when she spoke to Officer Marshall. It was not unreasonable, in this case, to find that Lucy was in a state of continuous excitement

from the time of the assault. [Citations.]" 633 F.2d at 85–86.

Similarly, the Colorado Court of Appeals in *People v. Stewart*, 39 Colo.App. 142, 568 P.2d 65, 68, cert. denied, (1977), upheld the receipt of the hearsay testimony of a police officer concerning statements made by the six-year-old sexual-assault victim two hours after she released herself from the tree to which she had been tied. See also *Wheeler v. United States*, 93 App.D.C. 159, 211 F.2d 19, 23–24 (1953), reh. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954).

In the case at bar Weiss testified that SP, who was three and one-half years old at the time, cried and screamed and complained of pain upon preparations for bed shortly after appellant returned her to the State Children's Home. According to Weiss, SP was obviously upset and volunteered that "daddy hurt me." Nevertheless, appellant asserts that this testimony does not fit within the "excited utterances" exception because Burgess, a second housemother who was present, testified that she first raised the possibility with SP that appellant had hurt her, thereby planting the idea in SP's mind. Furthermore, Burgess testified that SP was quiet during questioning.

Considering, as we must, the evidence in the light most favorable to the appellee and resolving all conflicts in the evidence for the appellee, *DS v. Department of Public Assistance and Social Services*, supra, 607 P.2d at 919–920, we cannot say that the trial court abused its discretion in admitting the testimony of Weiss pursuant to Rule 803(2). There was evidence that SP was in a state of excitement and that she appeared to be experiencing pain. The fact that she might also have exhibited signs of calmness does not rule out a finding that she was emotionally distraught. *United States v. Iron Shell*, supra. Neither does the fact that her remarks were made in response to an inquiry while she was in this state preclude application of the rule. Whether SP's statements were triggered by the abusive act during her home visit or the subsequent pain she experienced while being dressed for bed, see *United States v. Napier*, 518 F.2d 316, 317–318 (9th Cir. 1975), cert. denied 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128, we conclude that adequate safeguards against reflection and fabrication were present and that the hearsay testimony of Weiss was properly received under Rule 803(2).

Finally, appellant objects to the testimony of Dr. Lloyd Klatt, an emergency-room physician at Natrona County Memorial Hospital, who examined SP on the night of November 29, 1981, at the request of State Children's Home personnel. Relying on records prepared at the time of the medical examination, Dr. Klatt testified that the vaginal area and labia of SP were inflamed, and that SP told him that her father had hurt her. Based on this information, Dr. Klatt and an assisting specialist in gynecology diagnosed SP as a "probable molested child."

Regardless of whether SP's out-of-court declaration to Dr. Klatt was properly admitted,[16] Rule 703, W.R.E.,[17] authorizes receipt of an expert conclusion even when based on inadmissible hearsay, so long as other experts in the field would reasonably rely on similar evidence. *Madison v. Marlatt*, Wyo., 619 P.2d 708, 716 (1980). Since no evidence was presented as to the unreasonableness or nonexistence of reliance by other medical doctors on the patient's statements to diagnose abuse, Dr. Klatt's opinion testimony was properly received under Rule 703.

---

**16.** We need not address whether Dr. Klatt's testimony concerning SP's out-of-court statement was properly received into evidence, since this portion of his testimony was cumulative to that of Barbara Weiss, whose testimony we have held was properly admitted under Rule 803(2), W.R.E.

**17.** Rule 703, W.R.E., provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

## ISSUE NO. 8

### The Sufficiency of the Evidence

In our discussion, supra, of the general concepts which apply in this state to proceedings to terminate parental rights, we said that the right to associate with one's family is a fundamental liberty. We said that in reviewing any infringement of such a fundamental right we must exercise strict scrutiny.

 The State has a compelling interest in protecting the welfare of its children. *Matter of the Parental Rights of SKJ and SLJ*, Wyo., 673 P.2d 640, 642 (1983). So long as there is reason to believe that a positive, nurturing parent-child relationship exists, the State's interest coincides with the parents' interest in preserving, not severing, family bonds. *Santosky v. Kramer*, 455 U.S. at 766, 102 S.Ct. at 1401. Once a parent has been proven unfit, however, the State's interest in terminating that parent's rights arises. *Santosky v. Kramer*, supra, 455 U.S. at 767, n. 17, 102 S.Ct. at 1401, n. 17.

 We set out standards in *DS v. Department of Public Assistance and Social Services*, supra, to guide courts in determining when termination of parental rights would be permissible. There we said:

" * * * [W]e hold that a court may not terminate parental rights because of abuse or neglect unless the abuse or neglect renders the parent unfit in the context that such abuse or neglect poses a serious danger to the child's physical or mental well-being, i.e., clearly detrimental to the child. Thus, for example, punishment which may seem severe but which does not harm, is not such abuse as will suffice * * * to terminate parental rights. * * *

" * * * [T]ermination of parental rights cannot be ordered on the grounds of abuse or neglect unless the showing is clear and unequivocal that the child's health—mental or physical—and/or his social or educational well-being has actually been placed in jeopardy through the neglect or abuse by the parent." 607 P.2d at 919.

These standards are reflected in our present statute, § 14–2–309, supra, which establishes the grounds for termination of the parent-child legal relationship. See Comment, *Wyoming's New Termination of Parental Rights Statute*, 17 Land and Water L.Rev. 621, 623 (1982). In reviewing the case at bar, we must strictly scrutinize the application of § 14–2–309 to determine whether the State has proven these elements: (1) abusive treatment or neglect by the parent; (2) unsuccessful efforts to rehabilitate the family (i.e. termination of parental rights is the least intrusive means to satisfy the State's interest); and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent. Once these elements are established by competent, clear and convincing evidence, § 14–2–309(a), supra, then we can say that the State's compelling interest in preserving and promoting the welfare of its children will in fact be served by permanently removing these children from their parent.

In reviewing the facts of this case, we abide by the appellate directive to examine the evidence in the light most favorable to the appellee and to resolve all conflicts in evidence for the appellee. We will assume the evidence in favor of the successful party is true, disregard entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may fairly be drawn. *DS v. Department of Public Assistance and Social Services*, supra, 607 P.2d at 919–910.

### Abuse

We must examine the evidence of abuse with respect to each child to determine whether it meets the clear-and-convincing standard necessary to terminate appellant's rights to that child. "Abuse" as it is used in the parental-rights-termination statutes is defined in § 14–3–202(a)(ii), supra, which provides in pertinent part:

"(ii) 'Abuse' means inflicting or causing physical or mental injury, harm or immi-

nent danger to the physical or mental health or welfare of a child other than by accidental means, including * * * the commission or allowing the commission of a sexual offense against a child as defined by law:

"(A) 'Mental injury' means an injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in his ability to function within a normal range of performance and behavior with due regard to his culture;

"(B) 'Physical injury' means death or any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition;

"(C) 'Substantial risk' means a strong possibility as contrasted with a remote or insignificant possibility;

"(D) 'Imminent danger' includes threatened harm and means a statement, overt act, condition or status which represents an immediate and substantial risk of sexual abuse or physical or mental injury."

Thus, abuse may affect the mental as well as the physical health or welfare of the child and the harm posed by the abuse may be actual or imminent.

We will consider first the evidence of sexual abuse of SP. In late March, 1980, members of the State Children's Home staff observed that SP's vaginal area was unusually red. She was examined on March 26, 1980, by Dr. Martin Ellbogen, who was employed as a physician at the State Children's Home. He testified that SP's hymen was inflamed but that he was unable to specify the cause of injury.

There was testimony that SP's vaginal area was bright red and had an unusual odor following the children's visit home during Easter, 1980. Dr. Ellbogen testified that he examined SP at this time. He noted that her hymen was mildly swollen and that she appeared to have no new trauma.

Following a visit with appellant over Thanksgiving weekend, 1981, the housemothers noticed extreme redness around the vaginal-rectal area of SP. She was upset and crying and told the housemothers that appellant had hurt her. Dr. Klatt, an emergency-room doctor at Natrona County Memorial Hospital, examined SP following this visit home and diagnosed the cause of the injury as "probable molested child." There was evidence that appellant had sexually fondled SP and had encouraged JP to do so. JP testified on direct examination that he had seen LP sexually molest SP, although on cross-examination he stated that he had not seen this act but that it had happened.

 We believe that the evidence clearly and convincingly establishes that appellant committed a sexual offense against SP as defined by law. "Sexual contact" when committed by a parent against a child constitutes third-degree sexual assault under § 6–4–304, W.S.1977 (now recodified as § 6–2–304, W.S.1977, 1983 Replacement).[18] Sexual contact is defined in § 6–4–301(a)(vii), W.S.1977 (recodified as § 6–2–301(a)(vi), W.S.1977, 1983 Replacement), as follows:

The circumstances which cause the sexual contact in the instant case to constitute third-degree sexual assault are specified in § 6–4–303(a)(v) and (vi), W.S.1977 (recodified as § 6–2–303(a)(v) and (vi), W.S.1977, 1983 Replacement):

"(v) At the time of the commission of the act the victim is less than twelve (12) years of age and the actor is at least four (4) years older than the victim;

"(vi) The actor is in a position of authority over the victim and uses this position of authority to cause the victim to submit; * * *."

**18.** Section 6–4–305, W.S.1977, provided as follows:

"Any actor who subjects a victim to sexual contact under the circumstances of W.S. 6–63.2(a)(i) through (iv) [§ 6–4–302(a)(i) to (iv) ] or W.S. 6–63.3(a)(i) through (vii) [§ 6–4–303(a)(i) to (vii) ] under circumstances not constituting sexual assault in either the first or second degree commits sexual assault in the third degree."

When § 6–4–305, was recodified in 1983, the offense was reclassified as fourth-degree sexual assault.

" 'Sexual contact' means the touching for the purposes of sexual arousal, gratification, or abuse of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the clothing covering the immediate area of the victim's or actor's intimate parts; * * *."

Behavior of this sort, which constitutes a sexual offense under our statutes, obviously posed a serious danger to the physical and mental well-being of SP. *DS v. Department of Public Assistance and Social Services*, supra. Such conduct amounts to abuse within the meaning of § 14–2–309, supra.

The evidence concerning JP indicates that he had bruises on his body when he returned to the State Children's Home after spending Easter, 1980, with appellant and that appellant had hit him with an Easter bucket. The records of the State Children's Home for the week following Easter vacation, 1980, show that JP engaged in sexual play with other children during this time. He was aware of a number of sexual terms and drew suggestive pictures. There was evidence that JP observed LP sexually abuse SP. On one occasion, when LP and his wife were in bed together and all were unclothed, LP encouraged JP to touch his wife and SP.

■ We believe that this last-mentioned behavior constitutes sexual contact as defined by § 6–4–301(a)(vii), supra, and endangered the mental, if not the physical, welfare of JP. We conclude that competent, clear and convincing evidence establishes that appellant abused JP within the meaning of § 14–2–309, supra.

Turning to the evidence with respect to GP, there is no direct indication that LP sexually assaulted her, absent the inadmissible hearsay testimony to that effect. The records of the State Children's Home indicate that on April 20, 1980, GP exposed herself to young boys. Her vocabulary included slang terms for sexual acts. GP testified that appellant never hurt her, that on one occasion he got mad and "knocked off the light," that he spanked her on the

bottom and that he hit her on the arms, sometimes with a belt.

■ While there is no competent evidence that appellant sexually molested GP, we believe that the abusive behavior of appellant with respect to the other children constituted imminent, serious danger to the physical and mental welfare of GP. Her close proximity to these abusive acts and the fact that appellant had authority over her created an immediate and substantial risk of sexual abuse or physical or mental injury. Under our statutes, abusive conduct which will justify termination of parental rights need not have caused actual damage. Rather conduct which produces "imminent danger to the physical or mental health or welfare of a child," § 14–3–202(a)(ii), supra, will suffice. As we said in *DS v. Department of Public Assistance and Social Services*, supra:

"It would, indeed, be a sad commentary upon the law if it were unable to come to the aid of an abused or neglected child *until* there was an actual manifestation of some serious damage. We do not so hold. However, if the State wishes to demonstrate that parental abuse or neglect is sowing the seeds for future problems, it must do so in a more convincing manner than it did in this case." 607 P.2d at 922–923.

We conclude that in the instant case the State has clearly and convincingly demonstrated that appellant's abuse was sowing the seeds for future problems for GP.

*Efforts to Rehabilitate*

We now consider whether efforts by an authorized agency or mental-health professional have been unsuccessful in rehabilitating appellant. On July 27, 1981, appellant began counseling sessions with Dr. Dennis Mercadal at the Central Wyoming Counseling Center. Twelve sessions were held over a period of four months. Dr. Mercadal believed that appellant was progressing in these sessions, and in November, 1981, the children were permitted to resume home visits as a preliminary step toward reuniting the family. However, fol-

**1008**

lowing the third home visit SP exhibited signs of sexual abuse, and Dr. Mercadal concluded that efforts at rehabilitation had not succeeded. The following dialogue took place at trial:

"Q. Dr. Mercadal, regarding the statement that you felt there had been progress made by [LP] during this therapy, as a take off from that, did you feel the therapy had been effective?

"[Objection omitted.]

"A. Oh, no, I don't think so, not effective enough. ,

"Q. All right, and why is that your opinion?

"A. Because Mr. [P] sexually abused his daughter.

"Q. Following your intervention?

"A. Right."

 In *Matter of Parental Rights of PP,* supra, 648 P.2d at 515–516, we upheld the termination of parental rights where extensive efforts to protect the child through means less intrusive than termination had been attempted without success. In the instant case, although there was evidence that appellant had benefited from therapy, his counselor ultimately concluded that treatment had been unsuccessful. We hold that this uncontradicted, expert opinion testimony clearly and convincingly supports the trial court's finding that efforts by a mental-health professional to rehabilitate appellant had been unsuccessful.

*Future Health and Safety of the Children*

Finally, we direct our attention to whether the health and safety of the children would be seriously jeopardized by returning to appellant. Dr. Mercadal testified that, based upon his professional expertise and his experience with appellant, sexual abuse would again take place if appellant were reunited with his children.

David Nees, a clinical therapist at the Central Wyoming Counseling Center, testified that he met with appellant for seven one-hour counseling sessions between May and August of 1982. Based upon these contacts and his familiarity with the situation, Mr. Nees concluded that the children

would face "a very present danger" should they be reunited with appellant. We conclude that the expert opinions in this case provide clear and convincing evidence in support of the trial court's finding that the health and safety of the children would be seriously jeopardized by their return to appellant.

As a result of our strict scrutiny of the application of the parental-rights-termination statutes in this case, we hold that the State's compelling interest in protecting the welfare of these three children can be met only by terminating appellant's parental rights with respect to each child.

The judgment of the district court is affirmed.