IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 18, 2004 Session

## STATE OF TENNESSEE DEPT. OF CHILDREN'S SERVICES v. PAMELA ATKISON, et al
## IN THE MATTER OF T.J., DOB 2/15/99 A Child Under Eighteen Years of Age

Direct Appeal from the Juvenile Court for Gibson County
No. JC-17,598     Robert W. Newell, Judge

No. W2003-02109-COA-R3-PT - Filed April 30, 2004

This case involves the termination of the parental rights of Mother and Father over Child. Only Mother appeals the Juvenile Court's decision. Specifically, the Juvenile Court found clear and convincing evidence to terminate Mother's parental rights on the basis of abandonment, persistent conditions, and noncompliance with the permanency plan. In addition, Mother appeals the trial court's denial of her motion to transfer the case and have the issue presented to a jury. Finally, Mother asserts the trial court judge erred when he did not recuse himself. For the following reasons, we affirm the decision of the trial court.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., and HOLLY M. KIRBY, J., joined.

Richard W. Vaughn, Jr., Milan, TN, for Appellant

Paul G. Summers, Attorney General and Reporter, Juan G. Villaseñor, Assistant Attorney General, Nashville, TN, for Appellee

### OPINION

### Facts and Procedural History

Pamela Atkison ("Mother") and Claude Jackson ("Father") are the parents of T.J. ("Child"), who was born on February 15, 1999. In November 2000, Mother, who had custody of Child, gave Child to Father because of Mother's financial problems at that time. After approximately three months, in January 2001, Father filed a petition in the Juvenile Court of Madison County requesting

temporary custody of Child, citing Mother's actions and stating she had not called or returned for Child. The Juvenile Court issued an order granting Father temporary custody of Child. However, in August 2001, the state began an investigation concerning the use of methamphetamine in Father's home. This investigation resulted in Father's arrest for such use, and the Tennessee Department of Children's Services ("DCS") filed a petition alleging Child was dependent and neglected and requesting temporary legal custody of Child. DCS's petition cited Father's arrest and Mother's lack of a stable home or finances, as well as her irregular visits to Child for cause. The Juvenile Court issued an order bringing Child into the court's protective custody. In addition, the lower court placed Child with Michael and Chastity Jackson, Father's brother and sister-in-law.

On October 17, 2001, DCS and Mother established the initial permanency plan for Child. The initial permanency plan, which was approved by the Juvenile Court judge, stated that the goal of the plan was to return Child home, rather than termination of parental rights and adoption. The plan also identified a number of requirements which Mother was to meet: seeking counseling to address Mother's mental health issues, securing and maintaining safe and appropriate housing for no less than six months, securing and maintaining financial stability for no less than six months, understanding Child's developmental needs, and not abandoning Child.

Over the next year from the point at which Mother entered into the permanency plan, she visited Child sporadically, and, in fact, DCS lost all contact with Mother from April 2002 to August 2002 despite efforts to contact her. The county case manager with DCS and Child's foster mother, Kelly Lovall, supervised these visits and observed that Child neither recognized Mother as his real mother nor exhibited any signs of attachment. Since Child has come into the care of his foster parents in October 2001, Kelly and Terry Lovall (collectively the "Lovalls"), he has referred to them as "mom" and "dad." In addition, Mother admitted that, since August 2001, she has held eight different addresses, staying with friends and family. The longest period of time Mother has held on to a job since August 2001 is approximately four to five months, and she has worked for numerous different employers. In addition, Mother asserts she sought and completed counseling in February 2003, however, no documentation of successful completion was presented at trial. Mother admitted that, despite knowing about various housing authorities and employment agencies, she has been unable to maintain a stable job and home. After the initial permanency plan was established and requirements were set, DCS offered Mother counseling services in October 2001 and again in January 2003, offered Mother transportation to her visits with Child, relocated visits to Jackson, Tennessee, for Mother's convenience, and referred Mother to a number of shelters.

Due to Mother's lack of progress and the foster care review board's recommendation of adoption, DCS filed a petition to terminate Mother's and Father's parental rights to Child on October 24, 2002. Subsequently, DCS established a revised permanency plan, which was approved by the Juvenile Court judge, seeking adoption as the goal rather than a return of Child to his parents. After a hearing in May and June 2003, the Juvenile Court terminated the parental rights of Mother and Father. Mother timely appealed to this Court and presents the following issues, as we perceive them, for our review:

I.      Whether the trial court erred when it denied Mother's motion for a jury trial;
II.     Whether the trial court erred when it found DCS had proven grounds for termination by clear and convincing evidence;
III.    Whether the trial court erred when it found DCS had proven by clear and convincing evidence that it had made reasonable efforts to reunify the family; and
IV.     Whether the trial court erred when it denied Mother's motion requesting the trial court judge recuse himself.

For the following reasons, we affirm the decision of the Juvenile Court.

## Standard of Review

When a trial court in a civil action sits without a jury, we review its findings of fact *de novo* upon the record with a presumption of correctness, and, unless the evidence preponderates against the findings, we must affirm, absent an error of law. Tenn. R. Civ. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re L.J.C., A.L.C., & J.R.C.*, 124 S.W.3d 609 (Tenn. Ct. App. 2003). We review issues of law *de novo* with no presumption of correctness. *Valentine*, 79 S.W.3d at 546 (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)). Finally, decisions regarding recusal of a trial court judge will not be reversed on appeal unless a clear abuse of discretion appears in the record. *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001) (citing *State of Tenn. v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)); *Memphis Bd. of Realtors v. Cohen*, 786 S.W.2d 951, 953 (Tenn. Ct. App. 1989) (citing *Wiseman v. Spaulding*, 573 S.W.2d 490 (Tenn. Ct. App. 1978)).

## Jury Trial

Mother first argues that the Juvenile Court erred when it denied her request for a jury trial on the issue of termination of her parental rights. The Middle Section of this Court has addressed this issue as follows:

> The right to a jury trial stems from one of two sources. It can be guaranteed by the state or federal constitutions, or it can be based on a statute. The parents have not pointed to any statute giving them the right to a jury trial in a termination of parental rights proceeding. Accordingly, their right to a jury trial, if in fact it exists, must be constitutionally based.
>
> The parents assert that their right to a jury trial derives from U.S. Const. amend. VII. The Seventh Amendment, however, does not . . . apply to state court proceedings. *Minneapolis & St. Louis R.R. v. Bombolis*, 241 U.S. 211, 217, 36 S.Ct. 595, 596-97 (1916); *Eilenbecker v. Plymouth County*, 134 U.S. 31, 34-35, 10 S.Ct. 424, 425 (1890); *Elliott v. City of Wheat Ridge*, 49 F.3d 1458, 1459-60 (10th Cir. 1995). Thus the only possible remaining source of the parents' right to a jury trial must be Tenn.

Const. art. I, § 6. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 547, 91 S.Ct 1976, 1987 (1971) (the right to trial by jury in juvenile cases is a question of state law).

> Tenn. Const. art. I, § 6 does not guarantee the right to a jury trial in every civil case. It preserves the right to a jury trial only in those cases where the right existed at common law. *Newport Housing Auth. v. Ballard*, 839 S.W.2d 86, 88 (Tenn. 1992); *Harbison v. Briggs Bros. Paint Mfg. Co.*, 209 Tenn. 534, 541, 354 S.W.2d 464, 467 (1962); *Spurgeon v. Worley*, 169 Tenn. 697, 701, 90 S.W.2d 948, 949 (1936). Termination proceedings are civil in nature and statutory in origin. Accordingly, parents do not have a common-law right to a jury trial in a proceeding to terminate their parental rights. *Mays v. Department of Human Resources*, 656 S.W.2d 252, 253 (Ky. Ct. App. 1983); *In re Shane T*, 544 A.2d 1295, 1297 (Me. 1988); *In re Colon*, 377 N.W.2d 321, 328 (Mich. Ct. App. 1985); *In re C.L.A.*, 685 P.2d 931, 933-34 (Mont. 1984); *In re Clark*, 281 S.E.2d 47, 57 (N.C. 1981); *In re GP*, 679 P.2d 976, 983 (Wyo. 1984).

*In re S.M., Jr.*, No. 01-A-01-9506-JV-00233, 1996 WL 140410, at *5 (Tenn. Ct. App. March 29, 1996). Though Tennessee has recognized that due process requires the heightened burden of proof of clear and convincing evidence and the appointment of counsel for the respondent parents, Tennessee law does not allow a parent the option of having a jury determine if termination of parental rights is proper. Tenn. Code Ann. § 36-1-113(c); Tenn. Sup. Ct. R. 13 §1(d)(7); *Valentine*, 79 S.W.3d at 546-50; *In re S.M., Jr.*, 1996 WL 140410, at *5. Therefore, we hold the trial court did not err when it denied Mother's motion to transfer in order to obtain a jury trial.

## Grounds for Termination

In order for a court to terminate parental rights, that court must find, by clear and convincing evidence, that one of the grounds for termination exists and that such termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence" is defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). In this case, the trial court found that termination was proper on the grounds of (1) abandonment of the child, (2) substantial noncompliance with the statement of responsibilities in the permanency plan, and (3) the conditions which led to Child's removal still persist and are unlikely to be remedied. In addition, the trial court found that termination of Mother's parental rights was in the best interest of Child. Mother challenges the trial court's finding that DCS carried its burden of proof on these grounds. In order to prevail, Mother must demonstrate that DCS failed to carry its burden of proving any of these grounds since any one of these statutory grounds will support the termination of parental rights. *Id.* (citing *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)). We will address each one of these grounds and the factors determining the best interest of Child in turn.

## Abandonment

First, termination of parental rights may be based upon the ground of abandonment by the parent, as it is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1) (2003). "Abandonment" means that:

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i). For the purposes of this definition, "willfully failed to visit" means "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann § 36-1-102(1)(E). "Token visitation" means "the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)©).

Mother contends that the trial court erred when it found by clear and convincing evidence that Mother abandoned her child. Though it is true that there is undisputed testimony that Mother visited Child on three occasions in the four months preceding DCS's filing of the petition to terminate Mother's parental rights, the record supports the trial court's determination that such visitation was "token" as defined in the statute. The petition to terminate parental rights was filed by DCS on October 24, 2002. In this case, DCS lost contact with Mother from April 2002 to August 2002, despite DCS's efforts to contact Mother. Mother then visited Child on September 3, October 1, and October 15, 2002. Mother provided no explanation for this period of absence or lack of contact. There is no evidence in the record that establishes an inability to visit Child for lack of transportation, and, in fact, members of DCS testified they had offered to drive Mother to the scheduled visits. In addition, the visits with Child were arranged to be in Jackson, Tennessee, for Mother's convenience. The evidence was also undisputed that, when Mother did visit Child, there was a lack of attachment between Mother and Child to the point that Child did not realize that Mother was his natural mother. Finally, there is evidence that Mother was advised that such conduct could be grounds for the termination of her parental rights. Therefore, we hold that the trial court did not err when it determined that Mother had abandoned her child by engaging in no more than token visitation, whether classified as perfunctory or infrequent, in the four consecutive months prior to DCS filing its petition to terminate parental rights.

## Substantial Noncompliance

Next, Mother argues that DCS failed to carry its burden of proof for the ground of substantial noncompliance with the permanency plan. The Tennessee Code provides that termination of

parental rights may also be based upon the "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). A trial court must find that such responsibilities "are reasonable and are related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). In determining whether or not such noncompliance is substantial, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

The trial court found that the responsibilities outlined in the initial permanency plan of October 2001 were reasonable and related to remedying the conditions that necessitated foster care placement. It also found that Mother failed to comply with those responsibilities. We find no error in the trial court's determination. The responsibilities enumerated in the permanency plan–seeking counseling to address Mother's mental health issues, securing and maintaining safe and appropriate housing for no less than six months, securing and maintaining financial stability for no less than six months, understanding Child's developmental needs, and not abandoning Child–are all reasonable and related to remedying the conditions which necessitated foster care placement in this case. Mother in this case parted with Child because she was financially unstable and did not have a home in which she and Child could live. It was for these reasons that Mother gave Child to Father, leaving Child in Father's care.

The evidence is undisputed that Mother failed to meet the requirements of the permanency plan. The record is replete with testimony of DCS caseworkers, relatives, and Mother herself that Mother was unable to establish a stable home and income for six months. Mother admitted that she had held numerous jobs since Child was placed in foster care. In addition, she also admitted that she lived with various friends and family and that her current living arrangement was seven people living in a three bedroom apartment. Mother claimed that she completed a counseling course but produced no evidence of such successful completion. In addition, Mother ceased all visits with Child for a period of four months from April 2002 to August 2002. Such testimony is undisputed and supports the trial court's determination that grounds for termination of parental rights, based on substantial noncompliance with the permanency plan, exist. Therefore, this Court finds no error with this determination.

**Persistent Conditions**

Mother also argues that the trial court erred when it found that there was clear and convincing evidence that termination of parental rights was appropriate on the ground of persistent conditions. Tennessee law provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

. . . .

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A). We will address each requirement in turn.

First, it is undisputed that Child was in the state's care for more than six months when DCS filed its petition to terminate Mother's parental rights. Over a year passed from the time that a protective custody order was issued placing Child in the court's custody to the time that DCS filed its petition to terminate Mother's parental rights. Next, as noted above in our discussion of substantial noncompliance, the testimony of all relevant witnesses, even Mother herself, revealed that the conditions which led to DCS's involvement, Mother's instability of home and finances, still persisted at the time of trial. Third, there was no testimony to suggest that such conditions would be remedied at an early date. Mother was unemployed at the time of trial and lived with a number of people in a three bedroom apartment. Nothing in the record indicated that Mother was close to reaching the goals of a stable home or stable income. Finally, the record supports the finding that the continuation of the legal relationship between Mother and Child would greatly diminish Child's chances of early integration into a stable and permanent home. Every person that supervised the visits between Mother and Child stated that there were no signs of attachment. In addition, Child had already begun to refer to his foster parents as "mom" and "dad" and the testimony was undisputed that Child did not recognize that Mother was his natural mother. Kelly Lovall, Child's foster mother, testified that she loved Child and wanted to adopt him. Child had been in the care of the Lovalls for almost two years at the time of trial. The record supports the finding that the only thing "diminishing" Child's early integration into a safe, stable and permanent home was the continued relationship with Mother. *See In re L.J.C., A.L.C. & J.R.C.*, 124 S.W.3d 609 (Tenn. Ct. App. 2003). The trial court found that all requirements for persistent conditions were present, and after our review of the record, we hold there is clear and convincing evidence that the trial court was correct when it terminated Mother's parental rights on the ground of persistent conditions.

**Best Interest of the Child**

Finally, before a trial court may terminate a person's parental rights, in addition to finding a ground for termination by clear and convincing evidence, it must also find that such termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c). Tennessee Code Annotated § 36-1-113(i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The trial court found that termination of Mother's parental rights is in the best interest of Child. We must agree. First, Mother admitted that her circumstances had not changed since the court took protective custody of Child. She still did not have a stable home nor did she have a stable income. Mother did not maintain regular visitation with Child and fell out of contact with DCS for a four-month period in 2002. DCS caseworkers and Kelly Lovall supervised Mother's visits with Child and all testified that there were no signs of attachment between Mother and Child. As stated above, Child did not recognize Mother as his natural mother, but identified her as someone with whom he played. It was undisputed that Child now refers to his foster parents as "mom" and "dad" and shows an attachment to them. In addition, the Medina Elementary teacher who works with Child testified that stability in Child's life is important and that the stability with the Lovalls was the reason for Child's improvement. After reviewing the record, it would appear that none of the enumerated factors of Tenn. Code Ann. § 36-1-113(i) favors Mother. Therefore, we hold the trial court

-8-

committed no error in finding that the termination of Mother's parental rights is in Child's best interest.

## Reasonable Efforts By DCS

Mother next argues that the trial court erred when it found that DCS had made reasonable efforts to prevent Child's removal and reunify the family. Specifically, Mother contends that Tenn. Code Ann. § 37-1-166(a) requires that the trial court must determine whether reasonable efforts have been made to prevent the need for removal of a child from such child's family or make it possible for the child to return home. Such burden of proof is placed upon DCS pursuant to Tenn. Code Ann. § 37-1-166(b). Tenn. Code Ann. § 37-1-166(g)(1) defines "reasonable efforts" as follows:

> "[R]easonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to a child, as described in this subdivision, and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

Tenn. Code Ann. § 37-1-166(g)(1) (2001). We are mindful that "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *In re R.C.V. & O.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39 (Tenn. Ct. App. Nov. 18, 2002).

The Juvenile Court found that DCS exercised reasonable efforts to prevent removal and reunify Child with his family. After our review of the record, we hold that the evidence supports this finding. The testimony at trial revealed that members of DCS offered to transport Mother to her scheduled visits with Child. Despite this offer, Mother cancelled some of her visits and remained out of contact with DCS for a four-month period of time in 2002. DCS also moved such visitations to Jackson, Tennessee, for Mother's convenience. In addition, DCS offered Mother counseling services in October 2001 and again in January 2003 even after the petition to terminate parental rights was filed. There was no evidence that Mother attended, participated or completed this counseling. Though DCS did not contact the Jackson Housing Authority to expedite the process of acquiring a residence for Mother, DCS did refer Mother to some shelters at which she could remain until she was able to find suitable housing. In addition, Mother was aware of, and contacted, the Jackson Housing Authority on her own. Members of DCS also testified that attempts were made to offer services during 2002, however, Mother was out of contact with DCS for months and DCS could not locate her despite contacting Mother's attorney. Finally, DCS sought relative placements for Child, but Child's extended family was uninterested. Though it is likely that DCS could have done more for Mother, the record contains clear and convincing evidence that DCS made reasonable efforts to make it possible for Child to return home to Mother.

## Trial Judge Recusal

Finally, Mother argues that the trial court erred when the Juvenile Court judge did not recuse himself from the hearing. Specifically, Mother argues that, because the Juvenile Court judge approved the revised permanency plan, which set adoption as the new goal, and adoption necessarily requires the termination of Mother's parental rights, the judge erred when he failed to recuse himself from the termination hearing. As stated above, decisions concerning whether recusal is appropriate will not be reversed unless a clear abuse of discretion appears on the face of the record. *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001) (citing *State of Tenn. v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). "A motion to recuse should be granted if the judge has any doubt as to his or her ability to preside impartially in the case." *Id*. (citing *Hines*, 919 S.W.2d at 578). In addition, because perception is important, "recusal is also appropriate 'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Id*. (quoting *Alley v. State of Tenn.*, 882 S.W.2d 810, 820 (Tenn. Crim. Ct. App. 1994)). Here, the trial judge found the *responsibilities* outlined in the plan were in the best interest of the child and not adoption itself as Mother contends. The trial judge, before the hearing of May 2003 began, noted that a finding on the appropriateness of adoption was not even within his jurisdiction and that he was not making any findings concerning adoption. After our review of the record, we cannot say the trial judge abused his discretion by declining to recuse himself.

## Conclusion

For the foregoing reasons, we affirm the decision of the Juvenile Court. Costs of this appeal are taxed to Appellant, Pamela Atkison, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE

-10-